# 24-2825

## In the
## United States Court of Appeals
## for the Second Circuit

RONALD BARKER,

*Plaintiff-Appellant,*

-against-

ARAMARK UNIFORM AND CAREERS
APPAREL LLC,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

ROSENBERG LAW FIRM
*Attorneys for Plaintiff-Appellant*
137 Court Street, Fl. 2
Brooklyn, New York 11201
Tel: (718) 715-4845
office@rosenbergpllc.com
*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................ii.

PRELIMINARY STATEMENT .........................................................................1

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF ISSUES PRESENTED ...........................................................2

SUMMARY OF ARGUMENT ...........................................................................2

STATEMENT OF FACTS ...................................................................................4

    A.  Mr. Barker's Employment and Compensation Structure .................................4

    B. The 2016 Route Restructuring ...........................................................5

    C. The Discriminatory Removal of Stops .................................................6

    D. Retaliation and the "Let the Monkey Wait" Comment .............................8

    E. Financial Impact and Efforts to Obtain Relief ......................................9

    F. Discovery Issues and Missing Records .................................................10

    G. Constructive Discharge ....................................................................11

    H. Procedural History ..........................................................................11

ARGUMENT .....................................................................................................13

    A.    Standard of Review ...................................................................13

I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT BY FINDING NO GENUINE DISPUTE OF MATERIAL FACT EXISTED AS TO MR. BARKER'S TITLE VII CLAIM    14

    A.  Genuine Issues of Material Fact Exist as to Whether Mr Barker was Subjected to a Hostile Work Environment. ..........................................................14

    B.    The District Court Erred by Concluding No Genuine Dispute Existed as to Whether Aramark Created an Intolerable Work Environment ...........................17

II.    THE DISTRICT COURT ERRED IN DISMISSING MR. BARKER'S CLAIM FOR PUNITIVE DAMAGES .........................................................21

CONCLUSION ..................................................................................................22

CERTIFICATE OF COMPLIANCE ..................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Abrasam v. William Paterson Coll. of N.J.*,
260 F.3d 265 (3d Cir. 2001) ...................................................... 8, 15

*Aramark. Under Knox v. CRC Mgmt. Co., LLC*,
134 F.4th 39 (2d Cir. 2025) ...................................................... 20, 21

*Brockman v. NAES Corp., No. 3:19-CV-00006*,
2021 WL 863471 (D. Conn. Mar. 8, 2021) ...................................... 8, 15

*Green v. Brennan*,
578 U.S. 547 (2016) ................................................................ 19

*Kolstad v. American Dental Ass'n*,
527 U.S. 526 (1999) ................................................................ 21

*La Grande v. DeCrescente Distrib. Co.*,
370 F. App'x 206 (2d Cir. 2010) .................................................. 16

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015) ...................................................... 13

*National Railroad Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .............................................................. 1, 18

*Pennsylvania State Police v. Suders*,
542 U.S. 129 (2004) ............................................................. 14, 17

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ................................................................ 19

*Richardson v. New York State Dep't of Correctional Serv.*,
180 F.3d 426 (2d Cir. 1999) ...................................................... 14

*Under Henry v. Wyeth Pharms., Inc.*,
616 F.3d 134 (2d Cir. 2010) ...................................................... 16

*Under McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ................................................................ 19

*Under Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002) ........................................................ 22

*Vega v. Hempstead Union Free Sch. Dist.*,
801 F.3d 72 (2d Cir. 2015) ........................................................ 13

*Whidbee v. Garzarelli Food Specialties, Inc.*,
   223 F.3d 62 (2d Cir. 2000) ................................................................. 17

**Statutes**

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1331 ..................................................................................... 1

42 U.S.C. § 1981 ................................................................. 2, 3, 11, 21

42 U.S.C. § 2000e-5 ............................................................................... 1

**Other**

EEOC ....................................................................................................... 16

NYSDHR ................................................................................................. 11

Fed. R. Civ. P. 12 ................................................................................. 13

Fed. R. Civ. P. 56 ................................................................................. 13

## PRELIMINARY STATEMENT

Plaintiff-Appellant Ronald Barker appeals from the District Court's September 25, 2024 judgment granting summary judgment to Defendant-Appellee Aramark Uniform & Career Apparel, LLC on his Title VII constructive discharge claim. The District Court erred by: (1) creating an evidentiary Catch-22 that prevented Mr. Barker from using time-barred acts as background evidence to prove discriminatory motive, contrary to *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); (2) minimizing uncontroverted evidence of racial harassment and substantial economic harm; and (3) making improper credibility determinations at summary judgment.

This Court should reverse and remand for trial.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). This Court has jurisdiction under 28 U.S.C. § 1291. The District Court entered final judgment on September 25, 2024. (Dkt. 107). Mr. Barker timely filed his notice of appeal on October 21, 2024. (Dkt. 108).

1

## STATEMENT OF ISSUES PRESENTED

Whether the District Court erred in holding that time-barred discriminatory acts cannot be used as background evidence to prove the discriminatory motive behind a timely constructive discharge claim, contrary to *Morgan*.

Whether the District Court erred in finding no genuine issue of material fact where a Black employee presented evidence that his white supervisor removed profitable stops from his route while stating "this is how we look after our own" later told another employee to "let the monkey wait" and these actions caused and contributed to substantial hardship compelling resignation.

Whether the District Court erred in granting summary judgment on a claim for punitive damages under 42 U.S.C. § 1981a where a management-level decision-maker made racial epithets while taking adverse employment actions.

## SUMMARY OF ARGUMENT

The District Court committed reversible error by granting summary judgment on Mr. Barker's constructive discharge claim.

First, the District Court violated *Morgan* by creating an impossible evidentiary standard. While acknowledging that time-barred stop reassignments could serve as "background evidence," the Court then held Mr. Barker could not use this evidence to prove discriminatory intent. This Catch-22 effectively bars constructive discharge claims whenever the underlying discriminatory acts fall outside the limitations period.

Second, the District Court failed to view the evidence in the light most favorable to Mr. Barker. Uncontroverted evidence showed that District Manager Gambardella removed stops worth at least $186 in weekly commissions from Mr. Barker's route, transferred them to a white employee, and made racist comments including calling Mr. Barker a "monkey." The Court improperly minimized this evidence and made credibility determinations inappropriate at summary judgment.

Third, the District Court erred in dismissing the punitive damages claim. Evidence that a manager with decision-making authority used racial epithets while taking adverse employment actions is sufficient for a jury to find malice or reckless indifference under Section 1981a.

3

## STATEMENT OF FACTS

This appeal arises from the District Court's September 25, 2024 order granting summary judgment to Defendant-Appellee Aramark Uniform & Career Apparel, LLC ("Aramark") on Plaintiff-Appellant Ronald Barker's sole remaining claim for constructive discharge and punitive damages under Title VII. (A1005).

Mr. Barker, who is Black, alleged that Aramark intentionally created an intolerable work environment through discriminatory route reassignments, substantial pay reduction, and racially offensive comments, ultimately forcing his resignation.

### A. Mr. Barker's Employment and Compensation Structure

Ronald Barker began working for Aramark as a Route Sales Representative ("RSR") on March 5, 2014, at Aramark's Long Island Market Center. (A47). His starting hourly rate was $16 per hour. (A47). As an RSR, Mr. Barker was responsible for servicing Aramark customers by delivering and picking up uniforms, towels, and other rental products. He was a member of the Laundry, Distribution & Food Service Joint Board, Workers United Union. (A62).

4

In October 2015, Aramark and the Union entered into a new Collective Bargaining Agreement ("CBA") that changed RSR compensation from hourly wages to a commission-based structure. (A66). Under the CBA, RSRs received 10% of weekly commissionable revenue generated by their routes, including "Loss and Ruin" fees charged for damaged products. (A48, A59, A591). The CBA guaranteed a minimum of $800 per week plus $45 base pay for drivers with Mr. Barker's tenure, regardless of commissions earned. (A707).

Mr. Barker earned $54,794.47 in 2015. (A493). He testified he was one of Aramark's top three RSRs and had no write-ups, verbal warnings, or documented customer complaints in his personnel file. (A844).

### B. The 2016 Route Restructuring

In summer 2016, Aramark implemented an "Aramark Route Optimization" ("ARO") that reorganized all routes in the Long Island Market Center. (A856). According to then-General Manager Johnny Azar, the purpose was to "level the playing field" between white and Black drivers, as white drivers were being paid more, and to align routes geographically for better customer service. (A36-37; A856).

Following the ARO, Mr. Barker received a new route (Route 752) consisting of 119 stops that had historically generated average weekly revenue of $9,519.11. (A38, A43, A535). Mr. Barker was pleased with his new route, testifying that the way it was set up "was good." (A106). He excelled on this route, building up profitable stops. (A856).

For approximately 13-14 weeks following the ARO, Aramark paid RSRs their pre-ARO weekly average to ease the transition. (). Mr. Barker received at least $1,080.85 weekly during this period. (A1007-08).

## C. The Discriminatory Removal of Stops

### 1. October 2016 Stop Reassignments

In September 2016, David Gambardella became District Manager for the Long Island Market Center. (A47-48). In October 2016, without any documented performance issues or customer complaints in Mr. Barker's file, Gambardella removed thirteen stops from Mr. Barker's route. (A856-58).

Seven stops were reassigned to Brian Calhoun, a white RSR who also served as assistant shop steward. (A86, A438, A470, A1006-07). These included:

- Uncle Giuseppe's: $867.83 weekly revenue

6

- Security Dodge: $350.00

- Winthrop University Hospital: $355.63

- Tobay Printing: $142.74

- Official Offset Corp: $81.70

- Time Cap Labs: $40.00

- Crisray Printing: $121.85

- Levon Graphics: $256.16

- Additional stops totaling $3,583.67

(A865).

Six other stops were reassigned to a "Bulk Route" serviced by Braulio Estrada, a Hispanic RSR. (A499-500).

The stops transferred to Calhoun alone would have generated $358.37 in weekly commissions for Mr. Barker—nearly 45% of the $800 route minimum. (A735-36, A598-600).

### 2. Gambardella's Racist Comments

When Mr. Barker confronted Gambardella about the stop removals in December 2016, in the presence of Brian Calhoun and Eddie Piccola (shop steward), Gambardella stated: "this is how we look after our own." (A600, A622, A858). Mr. Barker testified that Calhoun then used what

7

Mr. Barker characterized as "stereotype racial epithets[,]" saying "you know what I'm saying, Homie" while crossing his arms in what Mr. Barker described as mocking behavior, like something you see "on exploited black movies." (A600).

The District Court, in its September 30, 2022 order denying Aramark's motion to dismiss, characterized Gambardella's "this is how we look after our own" comment as an example of "dog-whistle racism[,]" citing to *Brockman v. NAES Corp.*, No. 3:19-CV-00006, 2021 WL 863471, at *4 (D. Conn. Mar. 8, 2021) (quoting *Lloyd v. Holder*, 2013 WL 6667531, at *9 [S.D.N.Y. 2013]); *Abrasam v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) ("even the use of 'code words' such as 'all of you' and 'one of them' could be sufficient evidence from which a jury could find an intent to discriminate"). (A364).

### D. Retaliation and the "Let the Monkey Wait" Comment

Mr. Barker attempted to file a grievance about the stop removals through Brian Calhoun, who as assistant shop steward was responsible for filing grievances. Calhoun—who had received Mr. Barker's lucrative stops—never filed the grievance. (A437-439).

On January 27, 2017, Mr. Barker's union formally submitted a grievance on his behalf. (A503). After Mr. Barker pursued his grievance, Gambardella retaliated. One day in 2017, when Mr. Barker was first in line to check out, Gambardella called another driver, Jose Nunez, to cut ahead of him. When Nunez told Gambardella that Barker was ahead in line, Gambardella said: "let the monkey wait." (A616, A881, A939).

The NYSDHR's investigation found that the manager Dave Gambardella "frequently made racially-charged derogatory comments" with witnesses reporting Gambardella "mocking black people" and calling someone a monkey. (A89).

### E. Financial Impact and Efforts to Obtain Relief

#### 1. The removal of stops caused Mr. Barker's pay to decrease substantially.

From March 30, 2017 through August 11, 2017, Mr. Barker was typically paid only the route minimum of $800 plus $45 base pay. (A66, A309). This represented a significant decrease from his potential earnings with the removed stops.

Text messages between Mr. Barker and union representative Alvaro Bataro from March through November 2017 document Mr. Barker's ongoing efforts to address the situation:

9

- March 16, 2017: "I shouldn't have to sit around and wait until they are good and ready to give me a response on compensating me for the stops they have taking." (A120)

- June 13, 2017: The union proposed resolving the matter by "paying me 13 weeks of pay" from "the time they took my stops." (A-133-34).

- November 2017: Still no arbitration date had been set. (A122-A189).

Mr. Barker stated that the financial strain caused him "stress, tension at home, anxiety, a feeling of being 'less than' and a general feeling of low self esteem and zero self worth[,]" leading to depression and strain on family relationships. (A859, A1015).

### F. Discovery Issues and Missing Records

### 1. During discovery, critical issues arose regarding Aramark's financial records.

At a June 8, 2023 pre-trial conference, when Mr. Barker expressed inability to understand Aramark's financial spreadsheets, Magistrate Judge Reyes examined them and stated: "All right, if I'm having a hard time getting it, I think Mr. Barker is as well. No disrespect, Mr. Barker." (A470, lines 7-9).

10

Aramark's counsel then admitted: "Aramark does not keep the record of the revenue that is -- the commission that is paid to the RSR for the stop" and confirmed they do not maintain data that shows the commissions paid by stop to a route representative. (A464, lines 4-11).

Judge Reyes ordered Aramark to have a representative meet with Mr. Barker within two weeks to explain the financial spreadsheets. (A473-74). Aramark never complied with this order. (A864-65).

### G. Constructive Discharge

Unable to support his family on the reduced wages and facing continued racial hostility, Mr. Barker resigned from Aramark on August 10, 2017. (A505, A887). He testified: "I had to leave the company" because "I could not support [my] family with the money [I] was making." (A366, A609-610, A887).

### H. Procedural History

On January 24, 2018, Mr. Barker filed a charge of discrimination with the EEOC and NYSDHR; the NYSDHR found "probable cause" to support his allegations. (A290).

After receiving a Right to Sue letter, Mr. Barker filed this action on May 8, 2019, alleging violations of Title VII, 42 U.S.C. § 1981, and state

11

and city human rights laws. Following a settlement of certain claims, three rounds of dispositive motions ensued:

1) September 22, 2020: The Court granted partial summary judgment based on a settlement agreement but found the agreement ambiguous as to Title VII punitive damages. (A305-06).

2) September 30, 2022: The Court dismissed Mr. Barker's Title VII employment discrimination claim as time-barred but denied dismissal of his constructive discharge claim, finding he had "more than met his 'minimal burden of showing facts suggesting an inference of discriminatory motivation.'" (A314).

3) September 25, 2024: Following discovery, the Court granted summary judgment on the constructive discharge claim, finding the evidence insufficient despite acknowledging the stop reassignments could serve as "background evidence" but paradoxically holding they could not be used to prove discriminatory intent. (A1007, FN 1).

Mr. Barker timely appealed. (A1021).

## ARGUMENT

### A. Standard of Review

This Court reviews the District Court's grant of summary judgment de novo. *See*, e.g., *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 75 (2d Cir. 2015). All ambiguities must be resolved, and all reasonable inferences drawn, in favor of Mr. Barker, the non-moving party. Id. Summary judgment is appropriate only if the record demonstrates no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In employment discrimination cases, where an employer's intent is often a central issue, this Court has advised that summary judgment be applied with caution. *See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Significantly, the District Court had previously found Mr. Barker's constructive discharge claim plausible enough to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). (A365).

I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT BY FINDING NO GENUINE DISPUTE OF MATERIAL FACT AS TO MR. BARKER'S TITLE VII CONSTRUCTIVE DISCHARGE CLAIM

To establish constructive discharge under Title VII, an employee must show that the employer intentionally created working conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). Critically, Suders distinguished between constructive discharge resulting from ambient harassment and constructive discharge precipitated by an official act of the employer, such as a demotion or humiliating pay cut. Id. at 148. The District Court erred in concluding that Mr. Barker failed to present sufficient evidence to create a triable issue on these elements.

### A. Genuine Issues of Material Fact Exist as to Whether Mr. Barker Was Subjected to a Racially Hostile Workplace

A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment. *See Richardson v. New York State Dep't of Correctional*

14

*Serv.*, 180 F.3d 426, 437 (2d Cir. 1999). The District Court improperly minimized compelling evidence of such an environment.

### 1. The District Court Underestimated the Severity and Probative Value of Manager Gambardella's Racially Discriminatory Comments

When Mr. Barker confronted District Manager Gambardella about the removal of his profitable stops, Gambardella stated: "this is how we look after our own" or "this is how we take care of our own." (A37, A86, A501). The District Court itself, in its September 30, 2022 order denying Aramark's motion to dismiss, characterized this statement as an example of "dog-whistle racism[,]" (A364), and citing multiple cases: *Brockman v. NAES Corp.*, No. 3:19-CV-00006, 2021 WL 863471, at *4 (D. Conn. Mar. 8, 2021) (quoting *Lloyd v. Holder*, 2013 WL 6667531, at *9 [S.D.N.Y. 2013]); *Abrasam v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) ("even the use of 'code words' such as 'all of you' and 'one of them' could be sufficient evidence from which a jury could find an intent to discriminate").

Yet in its final summary judgment order, the Court found insufficient evidence of discriminatory intent; any inference, it argued, of racial meaning from the "we take care of our own" comment would

15

require "assuming that the 'we' and 'our own' referred to meant Caucasians, an assumption that only could be based upon the fact that Gambardella is white and Plaintiff is Black." (A530-31).

Furthermore, Gambardella's comment to another employee to "let the monkey wait" when referring to Mr. Barker is an unambiguously racial epithet. (A531). This Court has recognized that such severe slurs by a supervisor can independently establish severity. *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210 (2d Cir. 2010). Under *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149-50 (2d Cir. 2010), courts evaluate discriminatory remarks based on: (1) who made them; (2) when they were made; (3) their content; and (4) their context. Here, all factors weigh heavily in Mr. Barker's favor: the decision-maker made explicitly racist comments contemporaneously with adverse employment actions.

### 2. The District Court Failed to Consider the Totality of the Circumstances in this Case

The District Court erred by narrowly focusing on two offensive comments, only one of which was directed to Plaintiff, over the course of three-and-a-half years. This ignored the EEOC's finding that, in sum and substance, Gambardella frequently made racially-charged derogatory comments. (A611). It also ignored witness testimony that Gambardella

16

made racist comments toward other Black employees. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (harassment not directed at plaintiff contributes to hostile environment). When viewed cumulatively, a reasonable jury could find a racially hostile work environment.

**B.    The District Court Erred by Concluding No Genuine Dispute Existed as to Whether Aramark Created an Intolerable Work Environment**

*1. Gambardella's Removal of Stops Constituted an 'Official Act' Creating Intolerable Conditions*

Under Suders, when a constructive discharge is precipitated by an "official act" of the employer—such as "a humiliating demotion, extreme cut in pay, or transfer to a position in which [the employee] would face unbearable working conditions"—it constitutes a tangible employment action. *Suder*, 542 U.S. at 134. Here, District Manager Gambardella's removal of thirteen high-revenue stops from Mr. Barker's route was precisely such an official act.

The stops reassigned to Calhoun, as shown on his route sheet (A867, with a more legible stamped, record filing of same at Exhibit A), included Uncle Giuseppe's ($867.83), Security Dodge ($350.00), Tobay Printing ($142.74), Official Offset Corp ($81.70), Time Cap Labs ($40.00),

17

Crisray Printing ($121.85), and Levon Graphics ($256.16), among others. These documented stops alone totaled $1,860.28 in weekly revenue, which would have yielded Mr. Barker $186.03 in weekly commissions— over 23% of his $800 route minimum. This was not mere ambient harassment but a targeted managerial decision that fundamentally altered the economic terms of Mr. Barker's employment. Under Suders, this official act strengthens the argument that Mr. Barker's resignation was a foreseeable consequence of discriminatory actions that made continued employment financially impossible.

### 2. The District Court Committed Reversible Error by Refusing to Consider Time-Barred Acts as Background Evidence

The District Court acknowledged that the stop reassignments could serve as background evidence for the constructive discharge claim but then held that Mr. Barker could not use this evidence to prove discriminatory intent because doing so would "go to the heart of his time-barred employment discrimination claim and thus be inadmissible." (A1019).

This ruling directly contradicts *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), which explicitly held that Title VII does not bar an employee from using the "prior acts as background

18

evidence in support of a timely claim." Mr. Barker's constructive discharge claim is indisputably timely under Green v. Brennan, 578 U.S. 547, 554 (2016), as the limitations period began when he resigned on August 10, 2017. The stop reassignments are precisely the type of background evidence Morgan permits to show: (1) the discriminatory motive behind ongoing hostile treatment; (2) the magnitude of economic harm making continued employment untenable; and (3) the retaliatory pattern following complaints.

### 3. Genuine Issues of Material Fact Exist Regarding Financial Intolerability and Discriminatory Intent

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), Mr. Barker established a prima facie case: he is Black, performed satisfactorily (no disciplinary record), suffered adverse action (stop removals), and the stops went to a white employee. Even assuming Aramark proffered legitimate reasons, Mr. Barker presented substantial evidence of pretext under *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000):

a. Gambardella's 'dog-whistle racism' when confronted about the removals

b. The "let the monkey wait" comment showing racial animus

19

c. The complete absence of documented performance issues

d. The lucrative stops going to the white assistant shop steward who failed to file Mr. Barker's grievance

The combination of a 45% reduction in earning potential, explicit racial epithets, and retaliatory treatment presents genuine disputes requiring jury resolution.

C. **The District Court Improperly Weighed Evidence and Made Credibility Determinations**

The District Court accepted Aramark's characterization of Mr. Barker's pay reduction as minimal, failing to credit his evidence showing substantial lost commission potential of $186.03 weekly from the documented stops alone. It dismissed documented financial hardship evidenced by contemporaneous text messages stating he "shouldn't have to sit around and wait" for compensation and that the situation affected his "ability to take care of [his] family." (A202).

Moreover, Aramark's admission that it "does not keep the record of the revenue that is -- the commission that is paid to the RSR for the stop" (A464, lines 4-11), combined with its failure to comply with Judge Reyes's order to explain its financial documents, should have been weighed against Aramark. Under *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 45

20

(2d Cir. 2025), a plaintiff's sworn testimony is sufficient to create genuine issues of material fact sufficient to defeat summary judgment.

In short, there is no "self-serving" declaration rule that favors summary judgment against the plaintiff. *Id.*

## II.  THE DISTRICT COURT ERRED IN DISMISSING MR. BARKER'S CLAIM FOR PUNITIVE DAMAGES

A claim for punitive damages under Title VII requires showing that the employer engaged in discriminatory practices "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999).

The evidence in this record supports such a finding.

Gambardella, a management-level decision-maker, made explicitly racist comments while engaging in discriminatory conduct. He used his authority to remove profitable stops from a Black employee and transfer them to a white employee, stating "this is how we look after our own." When Mr. Barker sought redress, Gambardella retaliated with further racial harassment. Such conduct by a manager with decision-making authority demonstrates the requisite malice or reckless indifference.

Furthermore, Aramark's failure to maintain basic records showing commission calculations, combined with its non-compliance with a judicial order to explain its records, demonstrates reckless indifference to Mr. Barker's rights. Under *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002), such conduct can support adverse inferences that the missing data would have supported Mr. Barker's claims.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's grant of summary judgment and remand for trial on Mr. Barker's constructive discharge claim and request for punitive damages under Title VII; and for such other and further relief this Court deems just and proper.

DATED:    June 17, 2025

Respectfully submitted,

ROSENBERG LAW FIRM

By:  Jonathan Rosenberg, Esq.
137 Court Street, Fl. 2
Brooklyn, New York 11201
Tel: (718) 715-4845
office@rosenbergpllc.com
*Attorneys for Plaintiff-Appellant*

22

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed.R.App.P .3 2( a )(7)(B) because:

This brief contains 3,280 excluding the parts of the brief exempted by Fed.R.App.P.32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because:

This brief has been prepared in proportionally spaced typeface using Microsoft Word in Century font size 14.

Dated:  Brooklyn, New York
      June 17, 2025

                             _____
                             Jonathan Rosenberg, Esq.

Special Appendix

## TABLE OF CONTENTS TO SPECIAL APPENDIX

Memorandum and Order -- 9-25-2024.............................................. SPA1

Judgment -- 9-25-2024................................................................ SPA16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RONALD BARKER,

                Plaintiff,

                - against -

ARAMARK UNIFORM & CAREER
APPAREL, LLC,

                Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-2710 (PKC) (SMG)

PAMELA K. CHEN, United States District Judge:

Plaintiff Ronald Barker ("Plaintiff"), proceeding *pro se*, brings this action against his former employer, Defendant Aramark Uniform & Career Apparel, LLC ("Defendant" or "Aramark"), alleging violations of 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). After a motion for summary judgment and a motion to dismiss, the only surviving claim is one for constructive discharge and a demand for punitive damages pursuant to Title VII. Defendant now moves for summary judgment as to the sole remaining claim pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, Defendant's motion is granted.

## BACKGROUND

### I.    Relevant Facts[1]

Plaintiff is a Black individual who began working as a Route Sales Representative ("RSR" or "Driver") for Defendant, a company providing uniform services, such as uniform rentals, laundry service, and repairs, on or around March 5, 2014.  (Def.'s Loc. Rule 56.1 Statement of Undisputed Material Facts, Dkt. 94 ("Def.'s 56.1"), ¶¶ 1, 5, 11.)[2]  In the summer of 2016, Defendant restructured its drivers' routes, including Plaintiff's.  (*Id.* ¶¶ 33, 35.)  The purpose of the restructuring was, among other things, to improve customer service by ensuring routes consisted of stops that were aligned geographically.  (*Id.* ¶ 33.)  Plaintiff's new route following the restructuring consisted of 119 stops.  (*Id.* ¶ 36.)

---

[1] The facts below are taken from Defendant's Rule 56.1 statement, the parties' affidavits, and exhibits.  Unless otherwise noted, where Defendant's 56.1 statement is cited, the fact is undisputed or Plaintiff has pointed to no evidence in the record to contradict it.  Here, Plaintiff did not submit a Local Civil Rule 56.1 statement with his papers opposing Defendant's motion. Nevertheless, district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules," and a court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file [a Local Civil Rule 56.1] statement."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  Where the Court's independent review of the record yields evidence contrary to a given assertion in the moving party's Local Civil Rule 56.1 statement, or where a party fails to support an assertion by citing admissible evidence, the Court may reject that assertion.  *Id.* at 73–74.  Conversely, where the moving party's Local Civil Rule 56.1 statement is not contradicted by the Court's review of the record, then the party's assertions will be "deemed admitted as a matter of law" for the purposes of a summary judgment motion.  *Chitoiu v. UNUM Provident Corp.*, No. 05-CV-8119 (LAP), 2007 WL 1988406, at *1 & n.1 (S.D.N.Y. July 6, 2007) (granting summary judgment against *pro se* plaintiff who failed to respond to defendant's Local Civil Rule 56.1 statement of facts).  Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.

[2] As it must, the Court construes any disputed facts in the light most favorable to Plaintiff for purposes of Defendant's summary judgment motion.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

2

In October 2016, David Gambardella, Plaintiff's District Manager, reassigned six stops from Plaintiff's route to a white driver, Brian Calhoun.[3]  (Def.'s 56.1 ¶¶ 15, 47–49.)  According to Plaintiff, when he spoke with Gambardella about the stop-reassignment issue, Gambardella stated, "this is how we look after our own," and then employed "stereotypical 'Black phrases,'" such as "you know what I'm saying homie?"  (Ex. A to Fleming Decl., Dkt. 98-1 ("Pl.'s Dep. Tr."), at 185:18–186:25.)  Defendant does not dispute the veracity of this incident but cites to alternative reasons for reassigning stops from Plaintiff to other Drivers, including several complaints Defendant received from customers assigned to Plaintiff's route.  (Def.'s 56.1 ¶¶ 45–46.)  In response, Plaintiff alleges that he never received a single verbal warning or disciplinary notice from Human Resources about complaints from his route.[4]  (Pl.'s Mem. Opp'n Summ. J. Mot., Dkt. 91 ("Pl.'s Opp'n"), at ECF 2.)[5]  Eventually, seven more stops were reassigned from Plaintiff to other drivers—six stops were reassigned to Braulio Estrada in the Fall of 2016 and one stop was reassigned to Calhoun in February 2017.  (Def.'s 56.1 ¶¶ 54, 56, 68.)

Plaintiff contends that, following the reassignment of 13 stops from his original 119-stop route, his salary decreased significantly.  (Pl.'s Opp'n at ECF 4.)  All payments made to Plaintiff were in accordance with the terms of the Collective Bargaining Agreement ("CBA") between Defendant and Plaintiff's union, which stated that an RSR will be paid at least the weekly average of the amount they made prior to the route restructuring for a period of 13 weeks starting

---

[3] Though Plaintiff's discrimination claim based on the reassignment of stops is time-barred, for the reasons stated below, *see* Discussion *infra* Section I.A, the Court may consider these facts as background evidence for his constructive discharge claim.

[4] Though the record does not contain any further evidence or testimony regarding Plaintiff's disciplinary history at Aramark, the Court construes any disputed facts in the light most favorable to Plaintiff for purposes of this motion.  *See Adickes*, 398 U.S. at 157.

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

August 5, 2016.  (Def.'s 56.1 ¶¶ 40, 42.)  The CBA further stated that beginning November 2016, Plaintiff would be paid the greater of (a) the route minimum of $800, or (b) 10% of the commissionable revenue generated by the route.  (*Id.* ¶¶ 26, 30, 58.)

Between August and October 2016, Plaintiff was paid at least $1,080.85 for each full week that he worked.  (*Id.* ¶ 42.)  Between March 2017 and August 2017, Plaintiff was paid at least the weekly route minimum of $800 plus a $45 base pay for each full week that he worked.  (*Id.* ¶ 78.)  Plaintiff's new route did not generate more revenue than the route minimum during this period.  (*Id.* ¶ 79.)  Prior to the route restructuring, the average weekly revenue for the 119 stops assigned to Plaintiff was $9,519.11, of which $125.09 was attributed to Loss and Ruin ("L&R") fees.[6]  (*Id.* ¶ 37.)

Separately, Plaintiff alleges that one day in 2017, while he was in line outside Gambardella's office waiting to check in, Gambardella called one of Plaintiff's co-workers, Jose Nunez, to cut in front of Plaintiff.  (Pl.'s Dep. Tr. at 218:16–219:10.)  Nunez later[7] told Plaintiff that when Nunez told Gambardella that Plaintiff was ahead of him in line, Gambardella said, "let the monkey wait."  (*Id.*)  At his deposition in this case, Plaintiff testified that he did not hear

---

[6] Under the earnings formula effective November 2016, the hypothetical average weekly gross pay from the 119 stops would have been 10% of the commissionable revenue including L&R fees, (Def.'s 56.1 ¶¶ 25–26), which amounts to $951.90.

[7] Although the precise timing of Nunez telling Plaintiff about Gambardella's statement is unclear, Plaintiff's deposition testimony suggests that it might have happened the same day as the incident and that, at a minimum, it was before Plaintiff left Aramark.  In his deposition, Plaintiff first testified: "Jose told me right after he checked – checked him in" (presumably referring to Gambardella checking Nunez in that day).  (*Id.* at 217:18–20.)  Plaintiff then testified that he could not give "an exact date on when it was said," but that it was after Plaintiff filed his "grievance" (relating to stop-reassignments).  (*Id.* at 217:23–218:10, 178:6–22.)  Plaintiff further testified that he believed Nunez told Plaintiff shortly *before* Plaintiff resigned.  (*Id.* at 218:11–15.)  In January 2020, Nunez provided Plaintiff a sworn affidavit about the incident.  (Pl.'s Opp'n at ECF 31.)

4

Gambardella's comment to Nunez; he only saw Nunez get taken from the back of the line into the Gambardella's office ahead of Plaintiff. (*Id.* at 280:11–281:5.)[8]

Finally, while still employed at Aramark, Plaintiff applied for a job as a "driver" at another company, North Shore Linen. (Def.'s 56.1 ¶ 84.) On Thursday August 10, 2017, Plaintiff resigned from Aramark without giving notice, (*id.* ¶ 88), and began working for North Shore Linen five days later, (*id.* ¶ 91).

## II.    Procedural History

On January 24, 2018, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR"). (Compl., Dkt. 1, at ECF 6, 11.)[9] On May 8, 2019, Plaintiff filed the operative complaint in this action following the issuance of a Right-to-Sue letter by the EEOC. (*Id.* at 6 ("Right to Sue letter dated 2/14/2019").)

On September 22, 2020, the Court partially granted Defendant's motion for summary judgment, dismissing Plaintiff's New York State Human Rights and New York City Human Rights Law claims and his federal claim under 42 U.S.C. § 1981 as barred by a prior settlement agreement executed by the parties after Plaintiff filed his claims with the NYSDHR. (Dkt. 39 at 19.) The Court, however, declined to dismiss Plaintiff's punitive damages claim under Title VII, finding that the release in the parties' settlement agreement did not unambiguously cover that

---

[8] Defendant disputes Gambardella's comment as inadmissible hearsay. (Def.'s Mem. Supp. Summ. J, Dkt. 95 ("Def.'s Mem."), at 17–18.) For the reasons discussed below, *see* Discussion *infra* Section I.B, the Court will allow consideration of Gambardella's comment in the constructive discharge claim.

[9] Plaintiff's complaint in this action consists of the Court's standard *pro se* complaint form and over 200 pages of attached exhibits, which include, *inter alia*, Plaintiff's original NYSDHR complaint and the NYSDHR's Final Investigation Report and Basis of Determination. Plaintiff did not include a separate statement of facts with his complaint, but instead wrote "see attached files from New York State Division of Human Rights." (*See* Compl., Dkt. 1, at ECF 5.)

5

claim.  (*Id*. at 13–18.)   The Court accordingly authorized the parties to engage in limited discovery and additional briefing regarding the parties' intent with respect to the scope of the release.  (*Id*. at 19–20.)  In December 2020, Defendant renewed their summary judgment motion as to Plaintiff's Title VII punitive damages claim, again arguing that it was covered by the release under the settlement agreement, and also arguing that courts do not recognize a standalone punitive damages claim under Title VII.  (Dkts. 45–46.)   The Court denied that motion on September 30, 2021.  (Dkt. 52 at 2.)

On January 14, 2022, Defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), challenging the sufficiency of Plaintiff's Title VII claims, as alleged in the Complaint.  (Dkt. 60.)  On September 30, 2022, the Court granted Defendant's motion to dismiss as to Plaintiff's Title VII employment discrimination claim as time-barred but denied its motion as to Plaintiff's Title VII constructive discharge claim and demand for punitive damages. (Dkt. 65 at 6–9.)  Defendant then moved for reconsideration of the Court's Memorandum and Order, which the Court denied on October 18, 2022.  (Dkt. 69; 10/18/2022 Docket Order.)

On November 30, 2022, Defendant filed its Answer and Defenses to Plaintiff's Complaint.  (Dkt. 71.)  On May 26, 2023, Plaintiff was deposed by Defendant remotely. (Dkt. 84 at ECF 2.)  On June 6, 2023, Plaintiff filed a motion *in limine* to Suppress Tangible Evidence, Statement, and Identification Evidence, requesting an order "precluding the Defendant from using or referring to the Plaintiff's silence" and "an audibility hearing on the May 26, 2023 deposition."  (*Id*.)  On June 7, 2023, Defendant moved for a pre-motion conference to discuss its anticipated motion for summary judgment.  (Dkt. 83.)  On June 8, 2023, a pre-trial conference was held before the Honorable Ramon E. Reyes, Jr., then-United States Magistrate Judge, where Judge Reyes certified that discovery was complete and directed Defendant's representative to

meet with Plaintiff in person within two weeks to explain spreadsheets and other documents produced. (6/8/2023 Minute Entry.) On June 15, 2023, Defendant filed its response opposing Plaintiff's motion *in limine*. (Dkt. 85.) On June 27, 2023, the Court dismissed Plaintiff's motion *in limine* as premature without prejudice to renew after the parties file their joint pre-trial order. (6/27/2023 Docket Order.) The Court further denied Defendant's request for a pre-motion conference as unnecessary and set a briefing schedule for Defendant's summary judgment motion. (7/11/2023 Docket Order.) The summary judgment motion was fully briefed on October 10, 2023. (Dkt. 101.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam). Once this burden is met, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the

nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (quoting *Anderson*, 477 U.S. at 252). That is, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes*, 398 U.S. at 157–59. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis omitted).

The Second Circuit "liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (citations and quotations omitted). Nevertheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation omitted).

## DISCUSSION

The sole remaining claim in this action is Plaintiff's request for punitive damages pursuant to Title VII based upon a theory of constructive discharge. As a preliminary matter, Defendant raises two threshold challenges to Plaintiff's constructive discharge claim. First, to

8

the extent that Plaintiff relies on the reassignment of stops to support his claim, Defendant argues

that those allegations are time-barred. Second, to the extent that Plaintiff relies on David

Gambardella's alleged statement to Jose Nunez (referring to Plaintiff, "let the monkey wait") to

create a material issue of fact, Defendant argues that Gambardella's statements are inadmissible

hearsay. The Court considers each of these arguments in turn.

## I.      Threshold Challenges

### A.      Reassignment of Stops

Plaintiff's reliance on the reassignment of stops to support his constructive discharge

claim is not precluded by this Court's September 30, 2022 Order dismissing Plaintiff's

employment discrimination claim under Title VII. *See Barker v. Aramark Uniform & Career

Apparel, LLC*, No. 19-CV-2710 (PKC) (SMG), 2022 WL 4661507, at *3 (E.D.N.Y. Sept. 30,

2022); (*see also* Dkt. 65 at 6–7). In that Order, the Court found that the reassignment of stops

were "discrete acts" that were time-barred, and that the continuing violation exception did not

apply to Plaintiff's alleged lost wages resulting from the reassignments. *Barker*, 2022 WL

4661507, at *3.

The time-barred employment discrimination claim cannot be resurrected through the

vehicle of a constructive discharge claim. *See Kitani v. N.Y.C. Transit*, No. 19-CV-1043 (VSB),

2022 WL 874781, at *6 n.7 (S.D.N.Y. Mar. 24, 2022) ("Plaintiff's proposed constructive

discharge claim cannot help to revive the otherwise time-barred conduct either, because, even if

the constructive discharge claim is itself timely, it is still 'a discrete act that does not render the

alleged conduct that came before it timely.'" (quoting *Antrobus v. N.Y.C. Health & Hosps.

Corp.*, No. 19-CV-7449 (KPF), 2021 WL 964438, at *7 (S.D.N.Y. Mar. 15, 2021))). But the

stress and alleged loss of pay resulting from the reassignment of the stops can nevertheless serve

as background evidence to Plaintiff's constructive discharge claim. "It is well-settled that

plaintiff may rely on her time-barred allegations of defendant's misconduct 'as background evidence in support of [her] timely [constructive discharge] claim.'" *Cummings v. Brookhaven Sci. Assocs., LLC*, No. 11-CV-1299 (DRH) (ETB), 2011 WL 6371753, at \*14 (E.D.N.Y. Dec. 20, 2011) (alterations in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)) (first citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) and then citing *Sherman v. N.Y. Pub. Libr.*, No. 07-CV-0679 (SJF) (LB), 2008 WL 1968300, at \*6 n.7 (E.D.N.Y. Apr. 30, 2008)); *see also Sherman*, 2008 WL 1968300, at \*6 n.7 ("Although all of the discrete acts allegedly committed by defendant during plaintiff's active employment are not actionable as time-barred, plaintiff is not barred from using those prior acts as background evidence in support of her timely constructive discharge claim." (citing *Morgan*, 536 U.S. at 113)).  Indeed, in permitting Plaintiff's constructive discharge claim to proceed, the Court referenced the pay reduction that Plaintiff allegedly suffered as a result of the stop reassignments.  *See Barker*, 2022 WL 4661507, at \*4 ("Here, [as to the constructive discharge claim], Plaintiff not only alleges that his pay was reduced because he was 'left with less-paid stops,' but that he was also denied the benefit of commissions from 'loss-and-ruin pay.'").  The Court also noted that Gambardella's statements to Plaintiff saying, "this is how we look after our own," which took place around the time stops were reassigned, was evidence supporting a plausible inference of "dog-whistle racism" for purposes of a constructive discharge claim.  *Id.*

Here, in his opposition papers, Plaintiff states that the reassignment of stops "resulted in his salary decreasing significantly," (Pl.'s Opp'n at ECF 4), a fact borne out by Defendant's own evidence, (*see* Def.'s. 56.1 ¶¶ 37, 42, 78–79).  Plaintiff also testified during his deposition that he experienced increased levels of stress due to the reduction in pay following the reassignment of stops.  (Pl.'s Dep. Tr. at 219:23–220:5 ("Once Mr. Dave [Gambardella] took the . . . stops from

10

me, that made it stressful . . . [because] I am not going to the stops and making the same money I made.").)  Plaintiff further states in his opposition that the loss of pay:

> [W]as a financial strain which caused me stress, tension at home, anxiety, a feeling of being "less than" and a general feeling of low self-esteem and zero self-worth.  It put me in a state of depression, and it took me out of my normal happy self and put me in a state of no self-esteem.  It affected my relationships in a negative way with my wife, my children, and my closest family members . . . .  I began drinking daily, arguing with my wife and being hostile to those family members closest to me.

(Pl.'s Opp'n at ECF 5 (cleaned up).)  Thus, evidence of Plaintiff's stress and depression, though directly stemming from the decrease in pay following the reassignment of stops, can still be considered by the Court as background evidence in assessing his constructive discharge claim.

### B.     Hearsay Allegations

Defendant argues that Plaintiff's testimony and Jose Nunez's affidavit describing David Gambardella's "let the monkey wait" comment cannot support a constructive discharge claim because it is inadmissible hearsay.  (Def.'s Mem. at 17–18.)

A nonmoving party cannot rely on an affidavit or other evidence inadmissible as hearsay to create a genuine issue of material fact to survive a motion for summary judgment.  *See Hayden v. Walmart Stores, Inc.*, 619 F. App'x 22, 23–24 (2d Cir. 2015) (summary order) (affirming summary judgment where plaintiff relied on inadmissible hearsay to advance his discrimination claim); *see also Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 218 n.6 (2d Cir. 2000) ("Under Fed. R. Civ. P. 56(e), only admissible evidence may be used to resist a motion for summary judgment . . . .").  But here, both Nunez and Gambardella would presumably be available to testify at trial regarding Gambardella's statement, and the statement

11

itself is not hearsay because it is not being offered for its truth.[10]  Gambardella's comment, as discussed in Nunez's affidavit, is thus not precluded from being considered on a summary judgment motion.  *See Weyant v. Phia Grp. LLC*, 556 F. Supp. 3d 310, 320 (S.D.N.Y. 2021) ("That the declaration itself is hearsay is not an impediment on a motion for summary judgment, assuming that [the declarant] is available to testify at trial.").

Having ruled on the two threshold matters, the Court now turns to the merits of Plaintiff's constructive discharge claim and whether Plaintiff can prove that claim to a jury by a preponderance of the evidence.

## II.  Constructive Discharge

### A.  Legal Standard

"A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'"  *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (quoting *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)).  The Second Circuit has found two components of this standard: "the employer's intentional conduct" against the plaintiff and "the intolerable level" of the plaintiff's work conditions.  *Petrosino*, 385 F.3d at 229.  If a "reasonable person *subjected to the same conditions as the plaintiff* would have felt compelled to step down," a claim for constructive discharge may proceed.  *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) (emphasis in original).  The Court views Plaintiff's allegations regarding his working conditions on a cumulative basis.  *Id.*  (finding error in the district court's treatment of the various conditions set forth by plaintiff "as separate and

---

10   Nunez's affidavit describing Gambardella's comment and its surrounding circumstances states, "I will testify to it in court."  (Pl.'s Opp'n at ECF 31.)  Similarly, in his declaration, Gambardella states that he "ha[s] never made any racist comments about Plaintiff" and that he "would testify [to the matter] under oath."  (Gambardella Decl., Dkt. 97 ¶¶ 1, 23.)

12

distinct rather than additive"); *see also Timothy v. Our Lady of Mercy Med. Ctr.*, No. 03-CV-3556 (RCC), 2004 WL 503760, at *7 (S.D.N.Y. Mar. 12, 2004) (finding plaintiff's aggregated allegations sufficient to withstand a motion to dismiss where plaintiff alleged, *inter alia*, that she was passed over for positions for which she was qualified and that defendants "generally engaged in actions that made it more difficult for her to work").  A constructive discharge claim "requires a 'further showing' beyond what is necessary to establish a hostile work environment or retaliation claim, such that resignation qualified as a fitting response" to an intolerable work atmosphere.  *Bundschuh v. Inn on the Lake Hudson Hotels, LLC*, 914 F. Supp. 2d 395, 408 (W.D.N.Y. 2012) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004)).  "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Suders*, 542 U.S. at 149.

**B.     Analysis**

In the instant case, even resolving all factual disputes in Plaintiff's favor and considering those facts in the light most favorable to him, Plaintiff's resignation fails to rise to the level of a constructive discharge.

First, the majority of courts in this Circuit have found that statements more egregious than the two that Plaintiff experienced—one firsthand ("this is how we look after our own . . . you know what I'm saying homie?") and the other indirectly ("let the monkey wait")—are insufficient, as a matter of law, to establish a hostile work environment claim, which is a predicate to Plaintiff's constructive discharge claim.  *See, e.g.*, *Thompson v. Spota*, No. 14-CV-2473 (JMA) (AKT), 2018 WL 6163301, at *34–35 (E.D.N.Y. Aug. 23, 2018) (alleged comment that plaintiff was "a monkey in a suit" did not constitute "objectively severe or pervasive conduct"), *R. & R. adopted*, 2018 WL 4779101 (E.D.N.Y. Sept. 30, 2018); *Martin v. Walgreen Co.*, No. 16-CV-9658 (AKH), 2018 WL 3773987, at *5 (S.D.N.Y. Aug. 9, 2018) (allegations

13

that supervisors called plaintiff a "monkey" and a "black dog" were not sufficiently severe or pervasive to create a hostile work environment). Although there can be no doubt that the use of racial epithets and the word "monkey" to describe a human being in any context, let alone in the work environment, is loathsome, offensive, and "degrading and humiliating in the extreme," *United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 400–01 (S.D.N.Y. 2018) (finding evidence sufficient to show hostile work environment despite plaintiff not being present when comment was made) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)), here, the totality of the admissible evidence—two offensive comments, only one of which was directed to Plaintiff, over the course of three-and-a-half years—does not meet the threshold for a constructive discharge claim, which is higher than for a hostile work environment claim. *Suders*, 542 U.S. at 134.

Second, even adding in as background evidence the stress and depression that Plaintiff experienced following the stop-reassignments and decreased pay, *see Chertkova*, 92 F.3d at 90 (instructing that the court must view plaintiff's constructive discharge allegations regarding his working conditions on a cumulative basis), Plaintiff still cannot meet the high bar for establishing a constructive discharge claim, which requires, *inter alia*, a showing that the employer "*deliberately* [made] an employee's working conditions so intolerable that the employee is forced into an involuntary resignation," *Pena*, 702 F.2d at 325 (emphasis added) (citation omitted); *see Petrosino*, 385 F.3d at 229 (describing the two components of a constructive discharge claim as "the employer's intentional conduct" against plaintiff and "the intolerable level" of plaintiff's work conditions). In order to make this showing, Plaintiff would have to present evidence showing that the stop-reassignments and resulting loss in pay that

14

caused his stress and depression were racially motivated, which would go to the heart of his time-barred employment discrimination claim and thus be inadmissible.  (Dkt. 65.)[11]

Thus, based on the totality of the evidence, Plaintiff's constructive discharge claim cannot survive summary judgment.

## CONCLUSION

For the reasons described above, there is no genuine issue of material fact as to Plaintiff's constructive discharge claim.  The Court grants Defendant's Motion for Summary Judgment.[12] This case is dismissed with prejudice.  The Clerk of Court is respectfully requested to enter judgment and terminate this matter.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 25, 2024
Brooklyn, New York

---

[11] Furthermore, even if Plaintiff were permitted to introduce such evidence, it likely would be insufficient to make the requisite showing of racial animus.  Plaintiff does not dispute, that the gross pay he received between October 2016 (the first reassignment of stops) and August 2017 (Plaintiff's resignation) was within the acceptable gross pay amount pursuant to the terms of the CBA.  (*See* Def.'s 56.1 ¶¶ 30, 40; *see generally* Pl.'s Opp'n.)

[12] Plaintiff's request for punitive damages under Title VII is not a standalone cause of action and the Court therefore does not discuss it.  *See Kaye v. Storm King Sch.*, No. 11-CV-3369 (VB), 2011 WL 7101193, at *5 n.3 (S.D.N.Y. Nov. 18, 2011) (explaining that "42 U.S.C. § 1981a is not an independent cause of action, but rather functions as a remedy provision for violations of Title VII").

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
RONALD BARKER,

                    Plaintiff,

      v.

ARAMARK UNIFORM & CAREER APPAREL, LLC,

                  Defendant.
-----------------------------------------------------------------X

JUDGMENT

19-CV-2710 (PKC) (JAM)

A Memorandum and Order of the Honorable Pamela K. Chen, United States District Judge, having been filed on September 25, 2024, granting Defendant's Motion for Summary Judgment; and dismissing this case with prejudice; it is

ORDERED and ADJUDGED that Defendant's Motion for Summary Judgment is granted; and that this case is dismissed with prejudice.

Dated: Brooklyn, New York
       September 25, 2024

Brenna B. Mahoney
Clerk of Court

By:    */s/Jalitza Poveda*
       Deputy Clerk