# No. 24-2825

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

RONALD BARKER,

*Plaintiff-Appellant*,

v.

ARAMARK UNIFORM AND
CAREER APPAREL LLC,

*Defendant-Appellee*.

Appeal from Judgment of the United States District Court
for the Eastern District of New York, No. 19-CV-2710-PKC

## BRIEF OF DEFENDANT-APPELLEE
## ARAMARK UNIFORM & CAREER APPAREL, LLC

Melissa C. Rodriguez
Michael F. Fleming
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000

*Counsel for Appellee*
*Aramark Uniform & Career Apparel, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Aramark Uniform & Career Apparel, LLC ("Aramark"), now known as Vestis Services, LLC, states that Vestis Group, Inc. is the sole member of Vestis Services, LLC. Vestis Group, Inc. is 100% owned by Vestis Corporation. Vestis Corporation is a publicly traded company. No publicly held corporation owns 10% or more of the stock of Vestis Corporation.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ..........................................................................i

Statement of the Issues ....................................................................................4

Statement of the Case .....................................................................................5

    I.     Factual Background ...........................................................................5

    II.    Relevant Procedural History .............................................................11

          A.    Plaintiff Releases His Discrimination Claims. ........................11

          B.    After Releasing His Claims, Plaintiff Sues Aramark for Discrimination in the District Court. ......................................13

Summary of the Argument ...............................................................................18

Argument ......................................................................................................20

    I.     The District Court Correctly Determined, Based on the Totality of the Evidence, that Appellant's Constructive Discharge Claim Fails as a Matter of Law...............................................................20

          A.    The District Court Properly Applied the Demanding Standard Applicable to Appellant's Constructive Discharge Claim. ...............................................................21

          B.    The District Court Considered the Totality of the Circumstances in Assessing Appellant's Claim. .....................23

               1.    Appellant cannot establish that the adverse effects of the reassignment of stops created an intolerable work environment based on his race. ...........................25

               2.    Appellant cannot establish that the alleged comments created an intolerable work environment based on his race. ....................................33

          C.    Appellant Cannot Establish that Aramark Acted with Malicious or Racist Intent.........................................................38

    II.    The District Court Correctly Determined that Appellant Could Not Pursue Punitive Damages on His Constructive Discharge Claim. ...........................................................................................41

          A.    Appellant Cannot Pursue a Standalone Claim for Punitive Damages.....................................................................41

ii

## TABLE OF CONTENTS
(continued)

**Page**

B.    Appellant's Failure to Present Evidence in Support of His Request for Punitive Damages Was an Independent Basis to Grant Summary Judgment to Aramark ................................ 46

Conclusion ................................................................................................ 50

Certificate of Compliance ........................................................................ 51

Certificate of Service ............................................................................... 52

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ACR Sys., Inc. v. Woori Bank*,
  232 F. Supp. 3d 471 (S.D.N.Y. 2017) .........................................................42, 46

*Adams v. Festival Fun Parks, LLC*,
  560 F. App'x 47 (2d Cir. 2014) ....................................................................22, 23

*Antrobus v. N.Y.C. Health & Hosps. Corp.*,
  No. 21-891, 2023 WL 6784414 (2d Cir. Oct. 13, 2023), *cert.
  denied*, 144 S. Ct. 1071 (2024) ..................................................................26, 27

*Bailey v. Synthes*,
  295 F. Supp. 2d 344 (S.D.N.Y. 2003) ...............................................................31

*Bethea v. JP Morgan Chase & Co.*,
  No. 15-CV-3544, 2019 WL 4805141 (E.D.N.Y. Sept. 30, 2019).....................40

*Brevot v. N.Y.C. Dep't of Educ.*,
  299 F. App'x 19, 21 (2d Cir. 2008)..............................................................26, 29

*Butts v. Dept. of Hous. Pres. & Dev.*,
  No. 00-6307, 2007 WL 259937 (S.D.N.Y. Jan. 29, 2007), *aff'd*,
  307 F. App'x 596 (2009) ...........................................................................32, 38

*Cardwell v. Davis Polk & Wardwell LLP*,
  No. 19-10256, 2020 WL 6274826 (S.D.N.Y. Oct. 24, 2020) ...........................37

*Chin v. Port Auth. of N.Y. & N.J.*,
  685 F.3d 135 (2d Cir. 2012) ............................................................................29

*Cordova v. N.M. Tax. & Revenue Dep't*,
  No. 08-0681, 2011 WL 7164459 (D.N.M. Dec. 28, 2011) ...............................45

*D.C. v. Copiague Union Free Sch. Dist.*,
  No. 16- 4546, 2017 WL 3017189 (E.D.N.Y. July 11, 2017) .......................37, 38

*Dabney v. Christmas Tree Shops*,
 958 F. Supp. 2d 439 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v.*
 *Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014)............................24, 35, 38

*Delaney v. Bank of Am. Corp.*,
 766 F.3d 163 (2d Cir. 2014) ......................................................................24

*Del. State Coll. v. Ricks*,
 449 U.S. 250 (1980)....................................................................................29

*Eldridge v. Rochester City Sch. Dist.*,
 968 F. Supp. 2d 546 (W.D.N.Y. 2013)..................................................44, 46

*Excelsior Cap. LLC v. Allen*,
 536 F. App'x 58 (2d Cir. 2013)...............................................................42, 46

*Farias v. Instructional Sys., Inc.*,
 259 F.3d 91 (2d Cir. 2001) ........................................................................47

*Fincher v. Depository Tr. & Clearing Corp.*,
 604 F.3d 712 (2d Cir. 2010) ......................................................................21

*Flaherty v. Metromail Corp.*,
 No. 98-8611, 2001 WL 868011 (S.D.N.Y. July 31, 2001) ................................32

*Graham v. Watertown City Sch. Dist.*,
 No. 10-0756, 2011 WL 1344149 (N.D.N.Y. Apr. 8, 2011) .........................43, 46

*Green v. Brennan*,
 578 U.S. 547 (2016)................................................................................21, 44

*Gregory v. Inc. Vill. of Ctr. Island*,
 No. 14-CV-2889, 2015 WL 5093623 (E.D.N.Y. Aug. 28, 2015)...............26, 29

*Handsome, Inc. v. Town of Monroe*,
 No. 23-711, 2024 WL 2747142 (2d Cir. May 29, 2024) .............................26, 27

*Johnson v. Morrison & Foerster LLP*,
 No. 14-0428, 2015 WL 845723 (S.D.N.Y. Feb. 26, 2015)................................37

*Jones v. E. Brooklyn Sec. Servs. Corp.*,
 No. 11-6333, 2014 WL 4724699 (E.D.N.Y. Sept. 23, 2014)......................43, 46

*Kaye v. Storm King Sch.*,
No. 11-3369, 2011 WL 7101193 (S.D.N.Y. Nov. 18, 2011) ........................43, 46

*Kemp v. Regeneron Pharms., Inc.*,
117 F.4th 63 (2d Cir. 2024) ......................................................................20, 23

*Kolstad v. Am. Dental Ass'n*,
527 U.S. 526 (1999)..................................................................................47, 48

*Kwas v. Intergraph Gov't Sols.*,
No. 15-5897, 2016 WL 4502039 (E.D.N.Y. Aug. 24, 2016)......................42, 46

*Leibovitz v. N.Y.C. Transit Auth.*,
252 F.3d 179 (2d Cir. 2001) ................................................................24, 35, 38

*Martin v. Dickson*,
100 F. App'x 14 (2d Cir. 2004) .................................................................42, 46

*Martin v. Walgreen Co.*,
No. 16-CV-9658, 2018 WL 3773987 (S.D.N.Y. Aug. 9, 2018) ............34, 37, 38

*Mason v. Texaco, Inc.*,
948 F.2d 1546 (10th Cir. 1991) ........................................................................44

*McGullam v. Cedar Graphics, Inc.*,
609 F.3d 70 (2d Cir. 2010) ..............................................................................28

*MCM Prods. U.S. v. Botton*,
No. 16-1616, 2016 WL 5107044 (S.D.N.Y. Sept. 16, 2016).......................42, 46

*Miller v. Praxair, Inc.*,
408 F. App'x 408 (2d Cir. 2010) ...............................................................22, 23

*Molina v. Wells Fargo Bank, N.A.*,
No. 16-0207, 2017 WL 1184047 (D. Utah Mar. 29, 2017)................................44

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)..................................................................................26, 27

*Onodera v. Kuhio Motors, Inc.*,
No. 13-0044, 2013 WL 4511273 (D. Haw. Aug. 23, 2013)..............................45

*Pa. State Police v. Suders*,
542 U.S. 129 (2004)..................................................................22, 23

*Phillips v. DeAngelis*,
571 F. Supp. 2d 347 (N.D.N.Y. 2008), *aff'd*, 331 F. App'x 894 (2d
Cir. 2009).................................................................................42, 46

*Ramirez v. Bolster & Jeffries Health Care Grp., LLC*,
277 F. Supp. 3d 889 (W.D. Ky. 2017) .............................................44

*Regis v. Metro. Jewish Geriatric Ctr.*,
No. 97 Civ. 0906, 2000 WL 264336 (E.D.N.Y. Jan. 11, 2000)........33

*Romain v. Great Expressions Dental of N.Y. LLP*,
No. 16-1966, 2018 WL 3542858 (S.D.N.Y. July 20, 2018) ..............30

*Sanderson v. N.Y. State Elec. & Gas Corp.*,
560 F. App'x 88 (2d Cir. 2014)......................................................27

*Schechter v. Alpert*,
No. 05-10638, 2006 WL 8461750 (S.D.N.Y. Mar. 14, 2006) ....................43, 46

*Shultz v. Congregation Shearith Israel of City of N.Y.*,
867 F.3d 298 (2d Cir. 2017) ...........................................................21

*Sletten v. LiquidHub, Inc.*,
No. 13-1146, 2014 WL 3388866 (S.D.N.Y. July 11, 2014) .......................35, 38

*Staten v. City of New York*,
653 F. App'x 78 (2d Cir. 2016)........................................................28

*Stetson v. NYNEX Serv. Co.*,
995 F.2d 355 (2d Cir. 1993) ...........................................................38

*Tate v. City of New York*,
No. 16-1894, 2017 WL 10186809 (E.D.N.Y. Sept. 29, 2017).....................43, 46

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
663 F.3d 556 (2d Cir. 2011) ...........................................................47

*Thompson v. Spota*,
No. 14-CV-2473, 2018 WL 6163301 (E.D.N.Y. Aug. 23, 2018), *R.
& R. adopted*, 2018 WL 4779101 (E.D.N.Y. Sept. 30, 2018) .....................34, 37

*Van Wormer v. City of Rensselaer*,
    293 F. App'x 783 (2d Cir. 2008)...................................................................26

*Wiercinski v. Mangia 57, Inc.*,
    787 F.3d 106 (2d Cir. 2015) .....................................................................47

*Williams v. Dakota Cnty. Bd. of Comm'rs*,
    No. 08:09-201, No. 09-0201, 2010 WL 964699 (D. Neb. Mar. 10,
    2010) .......................................................................................................45

*Woodard v. TWC Media Sols., Inc.*,
    No. 09-CV-3000, 2011 WL 70386 (S.D.N.Y. Jan. 4, 2011), *aff'd*
    *sub nom. Lawless v. TWC Media Sols., Inc.*, 487 F. App'x 613 (2d
    Cir. 2012) ..........................................................................................36, 38

**State Cases**

*Hubbell v. Trans World Life Ins. Co. of N.Y.*,
    408 N.E.2d 918 (N.Y. 1980) ................................................................43, 46

*Rocanova v. Equit. Life Assur. Soc'y. of the U.S.*,
    634 N.E.2d 940 (N.Y. 1994) ................................................................42, 46

**Federal Statutes**

42 U.S.C. § 1981..............................................................................2, 13, 15

42 U.S.C. § 1981a...................................................................................43

42 U.S.C. § 1981a(b)(1)............................................................................47

viii

## **INTRODUCTION**

Plaintiff Ronald Barker worked as an industrial laundering delivery and pickup driver for Aramark for more than three years. During his employment with Aramark, through when he left to take a job with a competitor, Plaintiff never once reported or complained of discrimination. Then, months after taking his new job, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("SDHR"), accusing Aramark of discrimination on the basis of race. Specifically, Plaintiff alleged that Aramark had reassigned stops from his delivery route to another driver because of race and that a manager had made comments that Plaintiff believed were race-related.

The SDHR charge was the first Aramark learned of these allegations. And in 2019, to avoid the expense and disruption of litigation, Aramark and Plaintiff reached a settlement. In exchange for a confidential settlement payment, Plaintiff executed a broad release of all claims he was asserting before the SDHR. Defying that release, less than 30 days after entering into the settlement agreement, Plaintiff filed a complaint in the District Court asserting the exact same allegations and claims that he had asserted before the SDHR. Indeed, Plaintiff attached his entire SDHR case file to his complaint.

The District Court granted, in part, Aramark's pre-answer motion for summary judgment. The District Court held that Appellant's claims under the New

1

York civil rights laws and 42 U.S.C. § 1981 claims were barred by the settlement agreement. The District Court also held that the settlement agreement barred Plaintiff from pursuing claims under Title VII for *compensatory* damages. However, the District Court held that issues of material fact precluded summary judgment on a putative claim for *punitive* damages under Title VII.

The District Court further narrowed Appellant's claim when it granted Aramark's motion to dismiss the Title VII punitive damages claim insofar as it was based on untimely allegations occurring prior to March 30, 2017. Notably, this included Appellant's claims for disparate treatment based on the reassignment of stops on his route, all of which occurred prior to the statute of limitations period. As a result, the parties engaged in discovery on a narrow claim and theory of liability—a Title VII constructive discharge claim for punitive damages only.

In September 2024, the District Court granted Aramark's post-discovery motion for summary judgment. The District Court thoroughly analyzed the totality of the circumstances as established by the admissible evidence, drew every factual inference in Plaintiff's favor, and rightly concluded that Plaintiff could not meet the demanding standard applicable to constructive discharge claims as a matter of law. Specifically, the District Court considered the alleged adverse effects of the reassignment of the stops (notwithstanding their untimeliness) and credited as true Plaintiff's allegations about purported comments by his manager, and concluded,

consistent with the weight of authority, that such conduct did not rise to the level of intolerability necessary to support a constructive discharge claim.

In his brief, Plaintiff argues to this Court that the District Court failed to give proper weight to the reassignment of stops and the alleged comments, but the District Court plainly did so. That is reason alone to affirm. However, even if this Court engages in a de novo review of the record, it should still reach the same conclusion as the District Court: Appellant simply does not have evidence to satisfy the demanding standard of a constructive discharge claim—let alone the high standard for punitive damages under Title VII.

Specifically, Plaintiff complains about a de minimis diminution of pay that resulted from his route reassignment. Plaintiff testified that he took his family on a two-week vacation during the period he claims to have been on the verge of constructive termination. And the comments he complains of (which Aramark disputes) are significantly less severe than comments this Court and district courts in this circuit have found insufficient as a matter of law to establish a constructive discharge. Considered individually or in their totality, these circumstances (of which there is little supporting evidence beyond Plaintiff's self-serving testimony) do not rise to the level of a constructive discharge, much less warrant the imposition of punitive damages. The District Court's judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the District Court correctly held, based on the totality of the circumstances, that Appellant did not present sufficient evidence to satisfy the demanding standard applicable to his constructive discharge claim at summary judgment.

2.      Whether the District Court correctly held, consistent with overwhelming weight of authority, that Appellant could not maintain a claim for punitive damages.

4

## STATEMENT OF THE CASE

I. **Factual Background**

A. **Aramark Hired Appellant in March 2014.**

In March 2014, Aramark hired Appellant as a Route Sales Representative ("RSR") assigned to Aramark's Long Island Market Center ("LIMC"). A662; A568, 71:1-15; A578, 106:4-10. As an RSR, Appellant was responsible for servicing Aramark customers assigned to his route by picking up and delivering products (*e.g.*, uniforms, towels, floor mats) that the customers rented from Aramark. A566-67, 69:23-70:15. When he was hired, Appellant was paid $16 per hour. A662. As an RSR, Appellant was a member of Laundry, Distribution & Food Service Joint Board, Workers United Union (the "Union"). A561-62, 59:21-60:25.

In or around October 2015, Aramark and the Union entered into a new collective bargaining agreement. A702. Under the new terms, RSRs were paid a base amount (determined by their start date with Aramark) plus commission. Appellant's base pay was $45 per week. A707 § 7.3; A541 ¶¶ 7-8; A593-94, 153:25-154:3. The commission was calculated at 10% of the weekly commissionable revenue generated by the customer stops on the driver's route. A707 § 7.3; A541 ¶ 5; A572, 93:18:20; A573, 94:10-14; A576-77, 104:17-105:3; A589, 144:5-19. Commissionable revenue included rental charges and charges that were assessed to customers for lost or damaged products, which was known as "Loss and Ruin" or "L&R." A541 ¶ 6; A588, 138:5-11.

Aramark and the Union also agreed that, regardless of the amount of commission generated by an RSR's route, RSRs would be paid a minimum of $800 per week (the "Route Minimum"). A707 § 7.1; A771; A541 ¶ 9; A575, 97:20-25. If a route did not generate more than $800 in weekly commissionable revenue, the RSR would instead be paid the Route Minimum. *Id.*

### B. Aramark Reorganized the Routes in the LIMC in Summer 2016.

In the summer of 2016, Aramark reorganized all of the routes in the LIMC. A542 ¶¶ 12-15; A546-47 ¶ 3; A579-80, 108:24-109:13; A583-84, 130:24-131:4. The reorganization was called an "Aramark Route Optimization" or "ARO." A542 ¶ 14; A546-47 ¶ 3. The purpose of the ARO was, among other things, to improve customer service by ensuring routes consisted of stops that were aligned geographically and to better distribute revenue across the routes in order to bring RSRs' pay in line with the terms of the new CBA. A542 ¶¶ 12-15; A546-47 ¶ 3; A579-80, 108:24-109:13; A583-84, 130:24-131:4.

Following the reorganization, Appellant's new route (assigned number 752) included 119 stops on Long Island that previously had been serviced by other drivers, including Brian Calhoun. A578, 106:11-20; A582, 122:7-9; A725; A755. Prior to the reorganization, the average total commissionable revenue per week for these 119 stops was $9,519.11, of which $125.09 was attributed to L&R. A725; A542 ¶ 19.

Because the ARO was expected to affect drivers' weekly pay, Aramark agreed that for the first 13 weeks it would pay commissions equal to the greater of (a) the average weekly commission the driver earned before the reorganization or (b) the actual commissions generated by the driver's new route. A543 ¶ 20. Due to an administrative error, Aramark actually paid RSRs the pre-ARO weekly average for fourteen weeks. A707, Art. 7; A563-64, 63:25-64:5. After this period, beginning in November 2016, Aramark then compensated drivers based on the new CBA—i.e., the greater of (a) the Route Minimum (i.e., $800); or (b) 10% of the commissionable revenue generated by the route. A707, Art. 7; A563-64, 63:25-64:5.

From August 5, 2016, to October 28, 2016, Plaintiff's weekly pay was his $45 base pay plus at least $1,080.85, his average commission on his old route, except for the weeks when Appellant worked fewer than five full days—the weeks ending September 23, 2016, October 7, 2016, and October 21, 2016. A686-89; A760.

### C. Aramark Reassigned Stops from Appellant's Route Due to Service Concerns in Fall 2016 and February 2017.

Aramark received numerous complaints from customers on Plaintiff's new route about the service they received. A761. In September 2016, when David Gambardella became one of the two new District Managers assigned to the LIMC, he observed that Appellant routinely failed to service all of the stops on his route. A547 ¶ 6. And so, in October 2016, Mr. Gambardella reassigned six stops from Appellant's route to Mr. Calhoun's route. A548 ¶ 10; A771 Mr. Gambardella

reassigned these stops to Mr. Calhoun because (a) Mr. Calhoun had capacity on his delivery truck to service the accounts on their regular service day; (b) Mr. Calhoun had serviced many of these stops prior to the ARO and thus had a pre-existing relationship with the customers; and (c) the stops were geographically proximate to one another and/or other stops on Mr. Calhoun's route. A548-49 ¶¶ 11-13; A743-44.

Around the same time (October and early November 2016), Aramark also decided to create a new route in the LIMC that would be responsible for servicing a number of labor-intensive stops that generated less revenue. A549 ¶ 14. This new route was called the Bulk Route, was paid on an hourly basis, and was assigned to Braulio Estrada, who is Hispanic. A549 ¶¶ 15-16. Aramark reassigned stops from various RSRs' routes to the Bulk Route, including stops from Mr. Calhoun's and Plaintiff's routes. A549 ¶¶ 17-18.

Appellant claims that after his stops were reassigned, he asked fellow RSRs Edward Piccola (who served as the Union Shop Steward for the LIMC) and Mr. Calhoun (who served as the Assistant Shop Steward) to file a grievance on his behalf. A595, 178:9-21. Appellant further alleges that, in December 2016, after Mr. Piccola and Mr. Calhoun failed to file a grievance, he had a meeting with them and Mr. Gambardella. A597, 181:3-13.

According to Appellant, he learned for the first time at this meeting that stops

that were previously in his route had been transferred to Mr. Calhoun. A596-97, 180:24-181:13; A599, 185:18-22. Appellant alleges that when he asked Mr. Gambardella about the reassignment, Mr. Gambardella said something to the effect of "this is how we look after our own." A597, 181:20-21. Appellant also alleges that Mr. Calhoun responded to the effect of: "know what I'm sayin', homie" and crossed his arms. A600, 186:12-15. Appellant further alleges that Mr. Piccola also crossed his arms. A600, 186:17. **Appellant confirmed that apart from this alleged incident in December 2016, neither Mr. Gambardella, Mr. Calhoun, Mr. Piccola, nor any other Aramark employee ever made any comments to Appellant that he believes were related to his race.** A598, 182:4-9; A601-603, 187:14-189:5; A603-04, 189:22-190:3; A608, 201:16-21.

In January 2017, the Union filed a grievance on behalf of Appellant and "all affected employees" concerning violations of Article 7 (i.e., "Route Wages") of the CBA. A787, A789-794. The grievance contains no reference to any acts of discrimination, although such acts are prohibited under Article 3 of the CBA. A787. In or around February 2017, Mr. Gambardella reassigned another stop—Security Dodge—from Appellant's route to Mr. Calhoun's route after the customer complained about the level of service it was receiving. A550 ¶ 20. The Security Dodge stop was in close proximity to the stops that Mr. Calhoun already was servicing in Farmingdale, New York. A550 ¶ 12.

9

In or around March 2017, Appellant met with Shane Ehrsam, LIMC General Manager, and Kyle Calandro, LIMC Assistant General Manager, regarding the grievance. A605-06, 197:23-198:25. Appellant confirmed that neither Mr. Ehrsam nor Mr. Calandro ever said anything about Appellant that Appellant believes was related to his race. A607, 199:2-12. On August 11, 2017, i.e., the day after Appellant resigned from Aramark, the Union filed a demand for Arbitration of the grievance. A788. On October 3, 2019, the arbitrator presiding over Appellant's grievance, issued a decision denying the grievance as moot. A788.

### D. Aramark Paid Appellant Commissions Pursuant to the CBA for Several Months Before He Voluntarily Resigned in August 2017.

During the limitations period—i.e., March 30, 2017 (the earliest actionable date based on when Appellant filed his EEOC charge) to August 10, 2017 (when Appellant voluntarily resigned)—Aramark always paid Appellant commissions based on the commissionable revenue that was generated by the stops assigned to his route. A689-700; A544 ¶¶ 28-29; A800. Indeed, for 12 of those 20 weeks, Aramark paid Appellant his base pay plus commissions totaling more than the Route Minimum. The rest of the time, except for two weeks when Appellant did not work a full five days, Aramark paid Appellant his base pay plus the Route Minimum. A544 ¶¶ 28-29; A796.

While still employed with Aramark, Appellant applied for a position as a "driver" at a company called North Shore Linen, which competes with Aramark on

10

Long Island.  A798.  On August 10, 2017, Appellant informed Aramark that he was resigning his employment effective immediately, without notice.  800.  On or around August 15, 2017, Appellant began his employment with North Shore Linen, for which he was paid $22/hour.  A802.

Appellant testified that he expected to work between five and ten hours of overtime each week at North Shore Linen.  A624-25, 237:23-238:22.  Specifically, according to Plaintiff, at the time he resigned, he anticipated that his weekly compensation from North Shore Linen would be between $880 (with no overtime) and $990 (with ten hours of overtime).  A624-25, 237:23-238:22; A802.

## II.  RELEVANT PROCEDURAL HISTORY

### A.  Plaintiff Releases His Discrimination Claims.

On January 24, 2018, Appellant filed a Verified Complaint with the SDHR (hereinafter the "SDHR Complaint").  In the SDHR Complaint, Appellant alleged that Aramark engaged in "an unlawful discriminatory practice relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) because of race/color."  A31.

On July 24, 2018, the SDHR issued its Determination After Investigation, in which it found "probable cause" to proceed on Appellant's SDHR Complaint. A89. In the accompanying Final Investigation Report and Basis of Determination ("Final Report"), the SDHR Regional Director detailed the findings of the SDHR

11

investigation. A90. According to the SDHR, at a public hearing, the administrative law judge would have to resolve issues, "including, but not limited to, whether [Aramark] subjected [Appellant] to discriminatory comments, treatment and pay disparity." A94.

In April 2019, Appellant and Aramark reached an agreement to resolve Appellant's SDHR proceeding prior to the hearing. CAA3. In addition to a confidential monetary payment to Appellant, the SDHR Settlement Agreement also contained the following terms:

- "WHEREAS Barker and Aramark desire to settle and resolve fully and finally claims and allegations asserted by Barker in the SDHR Proceeding. . . . The parties wish to avoid lengthy, costly, and time-consuming litigation and wish to obtain full, final, and complete settlement of all claims and allegations asserted by Barker in the SDHR Proceeding[;]"

- "WHEREAS Barker expressly reserves any rights he may have to pursue any claims of racial discrimination and related issues not addressed within the purview and jurisdiction of the SDHR Public Hearing that is scheduled for 4/10 and 4/11/2019, before the Division. Additionally, this agreement does not in any way, preclude or inhibit Barker from pursuing whatever remedies that may be available to him in Federal Court, regarding said claims not addressed in the SDHR Hearing[;]" and,

- "Barker waives and releases any and all claims and allegations asserted in the SDHR Proceeding against the Company . . . arising from or relating to any and all acts, events and omissions alleged or that could have been alleged in the SDHR Proceeding[.]"

CAA4-5.

The Settlement Agreement also contains a merger clause, pursuant to which the parties both (a) acknowledged that the SDHR Settlement Agreement canceled,

superseded, and replaced any and all prior agreements between them, and (b) affirmed they only were relying on the express statements in the Settlement Agreement.  CAA9 ¶ 11.

### B.  After Releasing His Claims, Plaintiff Sues Aramark for Discrimination in the District Court.

Approximately one month after signing the SDHR Settlement Agreement, Appellant filed his complaint with the District Court.  A22.  The allegations in the complaint are the exact same allegations Appellant asserted before the SDHR.  A26 § III.E.  Indeed, Appellant's complaint attached and explicitly incorporated the entire SDHR case file.  A26 § III.E., A30-121, A122-249.

In September 2020, based on the release, the District Court granted Aramark summary judgment motion, pre-answer, on Plaintiff's claims under the New York State Human Rights Law, the New York City Human Rights Laws, and 42 U.S.C. § 1981.  A287.  The court also granted summary judgment on Plaintiff's Title VII claim for compensatory damages, leaving only Plaintiff's Title VII claim for punitive damages.  *Id.*

In September 2022, the District Court granted, in part, Aramark's motion to dismiss Appellant's remaining claim for punitive damages under Title VII.  A357. Specifically, the District Court dismissed Appellant's disparate treatment claim, holding:

In this case, [Appellant] alleges that, in 2016, Gambardella took stops

> from [Appellant's] route to give them to a white co-worker and, as a result, [Appellant's] wages declined. Under Title VII, Gambardella's reassignment of [Appellant's] stops constituted a "discrete act" of discrimination, triggering the 300-day period in which to file a charge with the EEOC. If [Appellant] was required to file an EEOC complaint regarding the 2016 event within 300 days, his claim would be time-barred because he did not file his EEOC claim until January 2018. The question then becomes whether the continuing violation exception applies to the ongoing loss of wages as a result of Gambardella's actions, in which case, his claim would be timely as he stopped working for Defendant on August 10, 2017. The Court finds that the continuing violation exception does not apply in this case as a matter of law. The Second Circuit has held that a continuing violation "is not established merely because an employee continues to feel the effects of a discriminatory act on the part of the employer." Therefore, [Appellant's] claim for punitive damages based on Title VII discrimination is time-barred, and Defendant's motion to dismiss is granted as to this claim.

A362-63 (internal citations omitted).

However, the District Court allowed Plaintiff to proceed on a claim of constructive discharge under Title VII for punitive damages. A363-65.

At the close of discovery, Magistrate Judge Reyes ordered counsel for Aramark to meet with Appellant to explain certain records that were produced by Aramark during discovery. *See* A444, 29:24-30:9 ("THE COURT: You're going to sit with Mr. Fleming – MR. BARKER: Uh-huh. THE COURT: – actually across the table. . . . So you're going to sit. You're going to go over the records that have been produced. You're going to talk about them and explain them, because I think

14

maybe you have everything you need to make your case, maybe.").[1]  That meeting was held between Aramark's counsel and Appellant on June 23, 2023.  A482.  At no time during the meeting did Appellant complain that an Aramark employee was not present during the meeting.  *Id.*  An Aramark employee was available by phone if Appellant had any questions that Aramark's counsel could not answer.  *Id.*  Appellant indicated at the end of the meeting that he did not have any unanswered questions.  *Id.*

However, following the meeting, Appellant submitted a "status report" to Magistrate Judge Reyes, in which Appellant complained, among other things, that an Aramark employee was not present during the meeting, but not seeking any relief.  A479.  Aramark filed a response with the Court, in which it explained that Appellant never raised a concern about the absence of an Aramark employee during the meeting with counsel and that an Aramark employee had been available by phone had Appellant raised any questions that counsel was unable to answer.  A482.  After receiving the parties' submissions, neither Magistrate Judge Reyes nor the District Court took any further action in response to Appellant's letter.

On September 25, 2024, the District Court granted Aramark's post-discovery

---

[1] During that conference, Aramark's counsel indicated that he may need a representative from Aramark present to help explain the records.  Magistrate Judge Reyes said that would be fine, but did not order Aramark to produce an employee to attend the meeting.  A444.

motion for summary judgment. A1005. The District Court acknowledged that "[t]he sole remaining claim in this action is [Appellant's] request for punitive damages pursuant to Title VII based upon a theory of constructive discharge." A1012. The District Court then found the following:

- "The time-barred employment discrimination claim cannot be resurrected through the vehicle of a constructive discharge claim. But the stress and alleged loss of pay resulting from the reassignment of the stops can nevertheless serve as background evidence of [Appellant's] constructive discharge claim. . . . [E]vidence of [Appellant's] stress and depression, though directly stemming from the decrease in pay following the reassignment of stops, can still be considered by the Court as background evidence in assessing his constructive discharge claim." A1013-15.

- "[E]ven resolving all factual disputes in [Appellant's] favor and considering those facts in the light most favorable to him, [Appellant's] resignation fails to rise to the level of a constructive discharge." A1017.

- "Although there can be no doubt that the use of racial epithets and the word 'monkey' to describe a human being in any context, let alone in the work environment, is loathsome, offensive, and 'degrading and humiliating in the extreme,' here, the totality of the admissible evidence—two offensive comments, only one of which was directed to [Appellant], over the course of three-and-a-half years—does not meet the threshold for a constructive discharge claim, which is higher than for a hostile work environment claim." A1018 (citation omitted).

- "[E]ven adding in as background evidence the stress and depression that [Appellant] experienced following the stop-reassignments and decreased pay, [Appellant]still cannot meet the high bar for establishing a constructive discharge claim, which requires, inter alia, a showing that the employer deliberately made an employee's working conditions so intolerable that the employee is forced into an involuntary resignation[.]" *Id.* at A1018 (cleaned up; citations omitted).

- "[E]ven if [Appellant] were permitted to introduce [evidence regarding the untimely reassignment of stops], it likely would be insufficient to make the

16

requisite showing of racial animus. [Appellant] does not dispute, that the gross pay he received between October 2016 (the first reassignment of stops) and August 2017 ([Appellant's] resignation) was within the acceptable gross pay amount pursuant to the terms of the CBA." A1019 n.11.

• "[Appellant's] request for punitive damages under Title VII is not a standalone cause of action[.]" A1019 n.12.

The District Court then held that "based on the totality of the evidence, [Appellant's]

constructive discharge claim cannot survive summary judgment." A1019.

17

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's Decision granting summary judgment to Aramark on Appellant's constructive discharge claim for punitive damages under Title VII.

First, contrary to Appellant's argument in his brief, the District Court properly considered as background evidence the reassignment of certain stops from Appellant's route in its analysis of Appellant's constructive discharge claim. The District Court's analysis recognized that Appellant could not avoid the application of the statute of limitations for claims based on the reassignment of the stops—which were discrete events that occurred prior to the statutory period—by recasting his claim based on those reassignments as one for constructive discharge.

Second, also contrary to Appellant's arguments in his brief, the District Court properly considered the alleged statements by Mr. Gambardella in its analysis of Appellant's constructive discharge claim. The District Court recognized that these alleged statements, which were assumed true for purposes of the analysis, were significantly less severe than other alleged statements that courts in this district found did not establish a constructive discharge.

Third, the District Court properly considered the totality of the circumstances, as established by admissible evidence, in its analysis of Appellant's constructive discharge claim. Consistent with the binding authority of this Court, the District

18

Court correctly concluded that Appellant's evidence did not meet the demanding standard applicable to constructive discharge claims at the summary judgment stage.

Fourth, the District Court properly determined that Appellant could not pursue an independent claim for punitive damages in the absence of a viable claim for constructive discharge. Moreover, the weight of authority establishes that Appellant could not maintain a standalone claim for punitive damages having released his substantive claims in the SDHR Settlement Agreement. Further, even if he could pursue such a claim, Appellant did not and could not present evidence to meet the heightened burden of establishing an entitlement to punitive damages.

For these reasons, the District Court's decision should be affirmed.

19

**ARGUMENT**

This Court reviews a district court's grant of summary judgment de novo. *Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 68 (2d Cir. 2024). Summary judgment is proper where no genuine disputes of material fact exist, and the moving party is entitled to judgment as a matter of law. *Id.* "Generally, speculation by the party resisting the motion will not defeat summary judgment." *Id.* (internal quotations and citation omitted).

## I. THE DISTRICT COURT CORRECTLY DETERMINED, BASED ON THE TOTALITY OF THE EVIDENCE, THAT APPELLANT'S CONSTRUCTIVE DISCHARGE Claim FAILS AS A MATTER OF LAW.

The District Court properly held that "even resolving all factual disputes in [Appellant's] favor and considering those facts in the light most favorable to him, [Appellant's] resignation fails to rise to the level of a constructive discharge." A1017. Critically, in reaching this decision, the District Court specifically considered, in depth, both the alleged adverse effects that Appellant attributes to the reassignment of his stops in 2016 and alleged statements made by Mr. Gambardella, i.e., the very evidence that Appellant now incorrectly claims the District Court ignored in reaching its decision. (*Compare* Appellant's Br. at 18-21 *with* A1017-19.) Having so considered, the District Court correctly concluded "based on the totality of the evidence, [that Appellant's] constructive discharge claim cannot survive summary judgment." A1019. The District Court's decision should be

20

affirmed.

**A.** **The District Court Properly Applied the Demanding Standard Applicable to Appellant's Constructive Discharge Claim.**

The District Court properly recognized that "[a] constructive discharge claim requires a further showing beyond what is necessary to establish a hostile work environment or retaliation claim, such that resignation qualified as a fitting response to an intolerable work atmosphere." A1017 (cleaned up; citations omitted).[2]

The District Court's analysis is entirely consistent with binding Supreme Court authority that "[t]he constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become **so intolerable** that a *reasonable* person in the employee's position would have felt *compelled* to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (emphasis added; citation omitted); *see also Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017) (granting summary judgment to defendant on constructive discharge claim); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (same).

---

[2] Appellant's arguments regarding a hostile work environment claim and the authority analyzing the same are inapposite. (Appellant Br. 14-17.) Appellant concedes that he is pursuing a constructive discharge claim against Aramark, not a hostile work environment claim. (*See, e.g., id.* 2 ("The District Court committed reversible error by granting summary judgment on Mr. Barker's constructive discharge claim.").)

Indeed, this Court has instructed that "**the [constructive discharge] standard is a demanding one**," and "**a constructive discharge cannot be proven merely by evidence that an employee preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant**." *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (emphasis added; cleaned up; citation omitted); *see also Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 50 (2d Cir. 2014) (holding that the "demanding" standard cannot be satisfied by a showing of "mere negligence or ineffectiveness" on the part of the employer) (citation omitted).

To the extent Appellant argues that *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), calls for the application of a different constructive discharge standard to his claims, his argument fails. (Appellant Br. 14, 17-18.) Appellant contends that the untimely reassignment of stops constitutes an "official act" that caused his "constructive discharge" several months later, and that "[u]nder *Suders*, this official act strengthens the argument that Mr. Barker's resignation was a foreseeable consequence of discriminatory actions that made continued employment financially impossible." (*Id.* at 18). However, nothing in *Suders* suggests, let alone holds that a constructive discharge claim based on "official act" is "stronger" than a constructive discharge claim based on allegations of harassment. Rather, the *Suders* court clarified that in the absence of an official act, an employer may rely on the

22

*Faragher/Ellerth* affirmative defense to a constructive discharge claim. 542 U.S. at 148-149; *see also id.* at 152 ("Following *Ellerth* and *Faragher*, the plaintiff who alleges no tangible employment action has the duty to mitigate harm, but the defendant bears the burden to allege and prove that the plaintiff failed in that regard.").

Tellingly, in the two decades since *Suder* was decided, this Court has continued to apply the same "demanding" standard to constructive discharge claims. *See Kemp*, 117 F.4th at 72 (holding appellant did not meet "demanding standard" under New York law); *see also Miller*, 408 F. App'x at 410; *Adams*, 560 F. App'x at 50. Whether based on a theory that his constructive discharge was caused by an "official act" or harassment, as discussed further below, Appellant's claims fail for the same reasons set forth in the District Court's Decision.

### B. The District Court Considered the Totality of the Circumstances in Assessing Appellant's Claim.

Appellant contends that the District Court failed to consider the totality of the circumstances in assessing his constructive discharge claim. (Appellant Br. 16-17.) There is no basis for this contention: to the contrary, the District Court expressly stated that it had considered the totality of evidence in reaching its decision. A1019. Further, Appellant's brief confirms that the "totality of the circumstances" he claims support his claim are (1) the alleged adverse effects of the diminution in his pay following the reassignment of his stops in 2016; and (2) two comments that he

23

alleges Mr. Gambardella made to Appellant in 2016 and to another RSR about Appellant at some time in 2017.[3] (Appellant Br. 18-21.) The District Court considered both in its analysis of Appellant's claim and found that, even when considered cumulatively, these "facts" did not create a triable issue as to whether Appellant was constructively discharged from Aramark on the basis of his race. (*See* A1017-19.)

---

[3] Notwithstanding Appellant's near-exclusive reliance on these two "facts" in his brief, he also argues that the District Court failed to consider other unidentified comments made by Mr. Gambardella to coworkers that Appellant contends are set forth in an "EEOC finding." (Appellant's Br. 16-17.) Presumably, Appellant means the probable cause determination of the SDHR. (*See* A611, 214:10-14.) The SDHR determination does not cite to any specific comment allegedly made by Mr. Gambardella, but even if it did, such statements would be inadmissible hearsay that cannot be used to prove a discrimination claim. *See, e.g.*, *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (affirming district court's decision not to consider at summary judgment a coworker's draft EEOC charge on hearsay grounds). Further, Appellant conceded that he never heard these alleged statements during his employment (A634, 270:25-271:4) and did not learn about them until **after** he resigned from Aramark (A265, 271:12-20). Accordingly, they could not form the basis of his constructive discharge claim. *See Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 182 (2d Cir. 2001) ("Title VII's prohibition against hostile work environment discrimination **affords no claim to a person who experiences it by hearsay**." (emphasis added)); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 459 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) ("Because the conduct reported by the coworker occurred in the 'backroom or pre-processing area,' not in the office area where [plaintiff] worked, and because she learned of it only through hearsay, it cannot be said that that conduct adversely affected the terms and conditions of [plaintiff]'s employment.").

**1. Appellant cannot establish that the adverse effects of the reassignment of stops created an intolerable work environment based on his race.**

> i. *Appellant's contention that the District Court did not give proper consideration to the untimely reassignment of stops fails on its face.*

As a threshold matter, Appellant's contention that the District Court did not properly consider the reassignment of his stops in connection with his constructive discharge claim fails on its face. (Appellant Br. 18-19.) Appellant concedes that these allegations are untimely. However, he claims that they should have been considered as "background evidence" in support of his claim. (*Id.*) The District Court did just that. *See* A1013 ("the stress and alleged loss of pay resulting from the reassignment of the stops can nevertheless serve as background evidence to [Appellant's] constructive discharge claim"), A1015 ("evidence of [Appellant's] stress and depression, though directly stemming from the decrease in pay following the reassignment of stops, can still be considered by the Court as background evidence in assessing his constructive discharge claim."). In particular, the District Court expressly stated that "even adding in as background evidence the stress and depression that [Appellant] experienced following the stop-reassignments and decreased pay, [Appellant] still cannot meet the high bar for establishing a constructive discharge claim[.]" A1018.

While the District Court refused to permit Appellant to resurrect his untimely standalone claims based upon the reassignment of stops by recasting those claims

under a constructive discharge theory, that decision was wholly consistent with authority from this Court. *See Handsome, Inc. v. Town of Monroe*, No. 23-711, 2024 WL 2747142, at *3-4 (2d Cir. May 29, 2024) ("The continuing violation doctrine is an exception to [the accrual] rule, and it applies when the defendant engages in a continuous pattern of wrongful behavior that cannot be said to occur on any particular day and no single instance of which is actionable on its own. . . . The doctrine does not apply to a series of discrete, though related, unlawful acts, each of which is actionable on its own.") (citation omitted); *Antrobus v. N.Y.C. Health & Hosps. Corp.*, No. 21-891, 2023 WL 6784414, at *2 (2d Cir. Oct. 13, 2023), *cert. denied*, 144 S. Ct. 1071 (2024) (holding that the continuing violation doctrine does not permit consideration of untimely discrete discriminatory acts in conjunction with an appellant's timely hostile work environment claim); *Gregory v. Inc. Vill. of Ctr. Island*, No. 14-CV-2889, 2015 WL 5093623, at *5 (E.D.N.Y. Aug. 28, 2015) ("[T]he Second Circuit has clearly stated that ongoing harms flowing from discrete events do not trigger the application of the continuing violation doctrine." (*citing Brevot v. N.Y.C. Dep't of Educ.*, 299 F. App'x 19, 21 (2d Cir. 2008) and *Van Wormer v. City of Rensselaer*, 293 F. App'x 783 (2d Cir. 2008))).

Appellant's contention that the District Court's analysis is inconsistent with *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (Appellant's Br. 18-19) does not withstand scrutiny. In *Morgan,* the Supreme Court

26

reaffirmed that claims based on untimely discrete events could not avoid the application of the statute of limitations by repackaging them as hostile work environment claims. *See Morgan*, 536 U.S. at 114. ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' [Plaintiff] can only file a charge to cover discrete acts that 'occurred' within the appropriate time period."). The *Morgan* Court went on to hold that hostile work environment claims were not time-barred so long as (A) "all acts which constitute the claim are part of the same unlawful employment practice" and (B) "at least one act falls within the time period." *Id.* at 122.

Consistent with *Morgan*, the District Court found that Appellant's constructive discharge claim was timely and denied Aramark's motion to dismiss that claim. *See* A364 n.6. However, as this Court has long recognized, discrete acts that are not part of the same unlawful employment practice cannot be "made timely" simply because another act that was part of a hostile work environment claim occurred within the statutory period. *See, e.g.*, *Handsome*, 2024 WL 2747142, at *3-4; *Antrobus*, 2023 WL 6784414, at *2; *see also Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 92 (2d Cir. 2014) (holding that complaints during statutory period about untimely discrimination do not render the prior discrimination

claims timely and that "[w]ere the rule otherwise, any claimant could circumvent the statutory limitations period simply by discussing incidents of harassment that occurred outside of the limitations period with her employer during the statutory limitations period").

Here, the only acts that are alleged to have occurred within the statutory period are (1) Appellant allegedly was told by another RSR that Mr. Gambardella referred to him as a "monkey" and (2) Appellant resigned to pursue employment with a competitor. A362-64. Mr. Gambardella's comment is not alleged to have been made in connection with the decision to reassign stops. Accordingly, it was not part of the same alleged "unlawful employment practice" as the reassignment. *See, e.g.*, *Staten v. City of New York*, 653 F. App'x 78, 80 (2d Cir. 2016) (holding that time-barred allegations—alleged derogatory comments, unjust punishment for failing to secure his locker, and withholding of benefits—"were insufficiently related to [plaintiff's] timely claims"—complaints about job assignments, orders that plaintiff disagreed with, or issues with the department confirming that plaintiff complied with internal rules—"to constitute a continuing violation"); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010) (holding that offensive comment during statute of limitations period did not render other, untimely comments part of the same work environment, including because timely comment was not made to plaintiff or with intention that she hear it).

28

To hold that Appellant's decision to resign was part of the same "unlawful employment practice" would—as the District Court recognized—contravene decades of authority holding that an act is not timely simply because the Appellant alleges to have suffered injury from the act during the statutory period. *See, e.g.*, *Brevot*, 299 F. App'x at 20 ("[Plaintiff] cannot argue that the 'continuing violation' doctrine allows her to maintain a § 1983 claim based on events that were completed in 1998 but still harm her now."); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) ("Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."); *Gregory*, 2015 WL 5093623, at *5; *c.f. Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("It is simply insufficient for [plaintiff] to allege that his termination gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination. The emphasis is not upon the effects of earlier employment decisions; rather, it is upon whether any present violation exists." (cleaned up; citations omitted)).

Consistent with that authority, this Court should affirm the District Court's conclusion that the allegations regarding the reassignments are untimely, and, even considered as background evidence, are not sufficient to satisfy the demanding standard applicable to constructive discharge claims.

   ii.  *The background evidence regarding the untimely reassignment of stops does not establish Appellant suffered intolerable working conditions.*

Even if more consideration is given to the reassignments, they do not give rise to intolerable working conditions that would have compelled a reasonable person to resign. Appellant testified at his deposition that the reassignment of the stops was "intolerable" because he was not making the same amount of money that he made before the ARO, which, in turn, caused him "stress." A616-17, 219:13-220:5. However, the undisputed record evidence does not support Appellant's claim. Notably, in the 41-week period between October 31, 2016 (i.e., when the compensation changes required by the CBA went into effect following the ARO) and August 10, 2017 (i.e., when Appellant voluntarily resigned from Aramark), Aramark paid Appellant total compensation of $40,501.95. A689-700; A544 ¶¶ 28-29. Over that same 41-week period in the year prior (i.e., November 2, 2015 to August 12, 2016), Aramark paid Appellant total compensation of $45,934.43. A690. Simply put, Appellant's constructive discharge theory is based on a change in compensation of only $5,432.48 (or 11.8%) as compared to his compensation during the same period in the prior year. This is insufficient as a matter of law to sustain a constructive discharge claim.

Indeed, courts routinely find that significantly larger reductions in pay are legally insufficient to establish a constructive discharge claim. *See, e.g.*, *Romain v.*

*Great Expressions Dental of N.Y. LLP*, No. 16-1966, 2018 WL 3542858, at *8 (S.D.N.Y. July 20, 2018) (holding as a matter of law that a 10%-33% reduction in annual pay could not support a constructive discharge claim); *Bailey v. Synthes*, 295 F. Supp. 2d 344, 355 (S.D.N.Y. 2003) (holding that a $15,000 decrease in compensation after realignment of sales territory was "hardly an offensive level of compensation" and was not constructive discharge).

Moreover, except for weeks when Appellant did not work a full five days, during that same period, Aramark always paid Appellant at least the Route Minimum and base pay. A707 ¶ 7.1; A541, A544 ¶¶ 9, 28-29; A575, 97:20-25; A689-700. Indeed, in 27 of the 41 weeks, Aramark paid Appellant ***more than*** the Route Minimum guaranteed by the CBA. A543-44 ¶¶ 20-21, 28-29; A708 ¶ 7.6; A686-700; A760. The Route Minimum and base pay were negotiated with Aramark by Appellant's Union on behalf of all of the RSRs (including Appellant). A541 ¶¶ 5-9; A702; A771; A563-64, 63:25-64:5; A572, 93:18-20; A573, 94:10-14; A575, 97:20-25; A576-77, 104:17-105:3, A588, 138:5-11; A589, 144:5-19; A593-94, 153:25-154:3 . The fact that the Union (and its members) believed that $800/week was a sufficient minimum wage for RSRs weighs heavily against finding that a reasonable person in Appellant's position would have found the compensation Appellant was paid in excess of that minimum to be intolerable.

Appellant's claim that he was unable to support his family based on his

31

compensation also is belied by the record. Appellant did not present any objective evidence to support this allegation of financial distress (e.g., past due notices, collection notices). Notably, Appellant took a week-long vacation in May 2017, during the period he claims he was relying on relatives to help him pay his bills and feed his children. A796; A574, 95:2-18. He also testified that in his pre-Aramark employment, he earned approximately $600 and $680 per week, i.e., hundreds of dollars *less* than what Aramark was paying him. A559, 51:12-18; A656. Appellant confirmed that he was able to support his family with those earnings from his prior job. A560, 53:19-21.

Further, and perhaps most tellingly, Appellant remained employed by Aramark for several months after the reassignments, and only resigned after he secured employment with North Shore Linen. A798; A624-25, 237:23-238:22; A625-26, 238:23-239:16.

Many courts have found similar facts significantly undermine a constructive discharge claim. *See Butts v. Dept. of Hous. Pres. & Dev.*, No. 00-6307, 2007 WL 259937, at *21 (S.D.N.Y. Jan. 29, 2007), *aff'd*, 307 F. App'x 596 (2009) ("A six month passage of time is sufficient to undermine a claim that working conditions were intolerable."); *Flaherty v. Metromail Corp.*, No. 98-8611, 2001 WL 868011, at *5 (S.D.N.Y. July 31, 2001) (holding plaintiff's employment for six months after circumstances giving rise to claimed constructive discharge "weighs heavily

32

against" claim); *Regis v. Metro. Jewish Geriatric Ctr.*, No. 97 Civ. 0906, 2000 WL 264336, at *12 (E.D.N.Y. Jan. 11, 2000) ("**An employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable**." (emphasis added)).

Accordingly, it is clear, based on the record evidence, that Appellant could not establish an intolerable work environment based on the reassignment of stops.

### 2. Appellant cannot establish that the alleged comments created an intolerable work environment based on his race.

#### i. *Appellant's contention that the District Court did not consider the alleged comments by Mr. Gambardella is demonstrably false.*

Appellant argues that the District Court "underestimated the severity and probative value" of the comments Appellant claims Mr. Gambardella made to and/or about Appellant. (Appellant Br. 15-16.) This argument entirely ignores the District Court's thorough analysis of those comments. A1017-18. Far from "underestimating" the comments, the District Court observed that "there can be no doubt that the use of racial epithets and the word 'monkey' to describe a human being in any context, let alone in the work environment, is loathsome, offensive, and degrading and humiliating in the extreme[.]" A1018 (cleaned up; citation omitted).

However, the District Court properly concluded that "the totality of the admissible evidence—two offensive comments, only one of which was directed to Appellant, over the course of three-and-a-half years—does not meet the threshold

33

for a constructive discharge claim, which is higher than for a hostile work environment claim." *Id.* (citations omitted).

The District Court's decision is wholly consistent with authority from this Court and numerous decisions from other district courts in this Circuit holding that significantly more severe conduct than what is alleged by Appellant here does not satisfy the demanding standard for a constructive discharge claim. *See, e.g.*, *Thompson v. Spota*, No. 14-CV-2473, 2018 WL 6163301, at \*34–35 (E.D.N.Y. Aug. 23, 2018) (alleged comment that Appellant was "a monkey in a suit" did not constitute "objectively severe or pervasive conduct"), *R. & R. adopted*, 2018 WL 4779101 (E.D.N.Y. Sept. 30, 2018); *Martin v. Walgreen Co.*, No. 16-CV-9658, 2018 WL 3773987, at \*5 (S.D.N.Y. Aug. 9, 2018) (allegations that supervisors called Appellant a "monkey" and a "black dog" were not sufficiently severe or pervasive to create a hostile work environment). Appellant offers no legitimate basis to distinguish his allegations from this authority.

        *ii.      The evidence regarding the alleged comments by Mr. Gambardella does not establish appellant suffered intolerable working conditions.*

Even if this Court were to find that the District Court should have given more weight to the comments allegedly made by Mr. Gambardella, it is clear that Appellant's constructive discharge claim still could not survive summary judgment.

As a threshold matter, as noted above, this Circuit has held definitively that

34

"Title VII's prohibition against hostile work environment discrimination **affords no claim to a person who experiences it by hearsay**." *Leibovitz*, 252 F.3d at 182 (emphasis added). Appellant conceded that he never heard Mr. Gambardella make the alleged "monkey" comment; indeed, he confirmed that he never heard Mr. Gambardella ever call anyone a "monkey." A612-619, 215:21-217:14, 218:16-222:8. Because Appellant admitted he never heard Mr. Gambardella make the alleged "monkey" statement, it cannot be considered as part of the work environment that Appellant claims compelled him to resign. *See Leibovitz*, 252 F.3d at 182.

Even if the alleged hearsay statement were purposely considered on summary judgment (and it should not have been), where, as here, "the only offensive statements are learned of secondhand, they are insufficiently 'severe and persuasive,' in and of themselves, to support a claim for a hostile work environment[.]" *Sletten v. LiquidHub, Inc.*, No. 13-1146, 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014) (holding that several alleged comments questioning plaintiff's sexuality and referring to plaintiff using slurs for homosexuals were offensive, but "their indirect nature prevents them, standing alone, from being sufficient to constitute the 'severe and pervasive' harassment"); *see also Dabney*, 958 F. Supp. 2d at 459 (S.D.N.Y. 2013) ("Because the conduct reported by the coworker occurred in the 'backroom or pre-processing area,' not in the office area where [plaintiff] worked, and because she learned of it only through hearsay, it

35

cannot be said that that conduct adversely affected the terms and conditions of [p]laintiff's employment."); *Woodard v. TWC Media Sols., Inc.*, No. 09-CV-3000, 2011 WL 70386, at \*12 (S.D.N.Y. Jan. 4, 2011), *aff'd sub nom. Lawless v. TWC Media Sols., Inc.*, 487 F. App'x 613 (2d Cir. 2012) ("[Appellant] relies heavily on the harassment allegedly suffered by other female employees at TWC. Even taking these allegations as true, where [Appellant] was not the direct recipient of harassing or threatening comments, they are far less persuasive in establishing a claim of hostile work environment.").

Appellant's reliance on the untimely "this is how we look after our own" comment similarly is unavailing. As the District Court observed in reviewing that claim in the full context at summary judgment, any suggestion that it was race-based requires assuming that the "we" and "our own" referred to meant Caucasians, an assumption that only could be based upon the fact that Mr. Gambardella is white and Appellant is Black.[4] There was no evidence presented that the comment should be construed otherwise.

---

[4] Appellant's reliance on the District Court's analysis of that comment at the motion to dismiss stage is misguided. While the District Court at the earlier stage held that the comments, if assumed to be true, satisfied the pleading standard for Appellant's claim, the District Court was not bound to conclude that the alleged statement satisfied Appellant's burden at the summary judgment stage, and it properly analyzed that allegation in its full context (including the absence of any evidence that the comment was intended to reference Appellant's race) when it ruled on Aramark's summary judgment motion.

Courts routinely find that membership in a protected class, standing alone, is insufficient to support a discrimination claim. *See, e.g.*, *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-10256, 2020 WL 6274826, at *26 (S.D.N.Y. Oct. 24, 2020) ("The deficiency of [Appellant]'s claims of discrimination . . . is resonant of the 'familiar faulty syllogism: something bad happened to me at work; I am (fill in the blank with one or more protected categories); therefore it must have happened because I am (fill in the blank with the applicable protected category).'") (citation omitted); *Johnson v. Morrison & Foerster LLP*, No. 14-0428, 2015 WL 845723, at *6 (S.D.N.Y. Feb. 26, 2015) ("The mere fact that [Appellant] is a member of those protected groups is necessary to state a claim under Title VII and the ADEA, but it is plainly insufficient by itself to support an inference of discrimination because of those protected characteristics.").

Moreover, as noted above, courts have found that comments significantly more egregious than those alleged here are not sufficiently severe or pervasive to meet the even lower standard for a hostile work environment claim under Title VII. *See, e.g.*, *Martin*, 2018 WL 3773987, at *5; *Thompson*, 2018 WL 6163301, at *34-35; *D.C. v. Copiague Union Free Sch. Dist.*, No. 16- 4546, 2017 WL 3017189, at *1, *10 (E.D.N.Y. July 11, 2017) (allegations [Appellant] was told "come here, monkey" and that another student drew a picture of Appellant as a monkey in a tree were "not sufficiently severe or pervasive to state a claim [for a hostile environment]

37

arising under Title VI").

Because the alleged comments by Mr. Gambardella are insufficient to state a claim for hostile work environment, they also cannot as a matter of law satisfy the higher standards applicable to Appellant's constructive discharge claim. *Leibovitz*, 252 F.3d at 182; *Dabney*, 958 F. Supp. 2d at 459; *Woodard*, 2011 WL 70386, at *12; *Sletten*, 2014 WL 3388866, at *7; *Martin*, 2018 WL 3773987, at *5; *Copiague Union Free Sch. Dist.*, 2017 WL 3017189, at *1, *10.

## C. Appellant Cannot Establish that Aramark Acted with Malicious or Racist Intent.

The only "official act" that Appellant relies on in support of his constructive discharge claim is the reassignment of stops and the purported adverse consequences stemming therefrom, namely, the alleged reduction in his compensation. The law is clear that "[a] reduction in pay, without additional evidence of malicious intent, is insufficient to establish a claim of constructive discharge." *Butts*, 2007 WL 259937, at *20 (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993)). Appellant presented absolutely no evidence of malicious intent on the part of Aramark with regard to the reassignment of stops (or any other complained of action).

Conversely, Aramark presented ample evidence demonstrating that the reassignments were made for legitimate, non-discriminatory business reasons that Appellant could not show were false or pretextual. Specifically, Aramark presented

38

evidence that:

- Six of the stops were assigned in an effort to improve Appellant's ability to service the remainder of his route, which he had demonstrable difficulty doing following the ARO, as corroborated by voluminous records of complaints received from customers assigned to Appellant's route. A547-48 ¶¶ 6, 10; A771

- The reassignment of stops to Mr. Calhoun's route was for non-discriminatory reasons, including (a) that Mr. Calhoun had serviced many of these stops prior to the ARO; (b) that Mr. Calhoun had capacity to service these stops on their regular service day(s); and/or (c) that the stops had geographic proximity to other stops on Mr. Calhoun's route. A548-49 ¶¶ 11-13; A743-44.

- The reassignment of stops from [Appellant's] route to the Bulk Route was for non-discriminatory reasons, namely, to consolidate a number of labor intensive, low revenue stops onto a single route. A549 ¶ 14.

- The Bulk Route was assigned to a Hispanic RSR, not a white RSR. A549 ¶ 15.

- Several other RSRs, including white RSRs like Mr. Calhoun, also had stops reassigned to the Bulk Route. A549 ¶ 18.

Appellant also presented no evidence to contest these reasons or to suggest

(let alone establish) that Aramark acted maliciously in the reassignment of customer stops from his route. Further, Appellant acknowledged several times during his deposition that an RSR's pay could fluctuate from week to week due to "multiple factors," including changing customer needs and the RSR's ability (or inability) to "make sales" and "get L&R." A576-77, 104:11-105:6; A589, 144:16-17. There is no evidence that Appellant's pay was affected by anything other than these market factors and/or his own ability to service the customers. A543 ¶ 26.

Similarly, Appellant presented no evidence that the change in pay was due to anything other than the conversion of his compensation from an hourly rate prior to the ARO to commission-based pay after the ARO. A543 ¶ 26. Indeed, Appellant conceded that the purpose of the ARO was to "level the playing field" for RSR compensation, not to maliciously harm Appellant (or any other RSR). A580, 109:2-13. This evidence rebuts any suggestion that Aramark acted maliciously in the reassignment of stops from Appellant's (which, again, occurred outside the statute of limitations period).

Moreover, "it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable only when it occurs because of an employee's protected characteristic." *Bethea v. JP Morgan Chase & Co.*, No. 15-CV-3544, 2019 WL 4805141, at *10 (E.D.N.Y. Sept. 30, 2019) (cleaned up; citation omitted). As explained above, Aramark had legitimate, non-

40

discriminatory reasons for reassigning the stops from Appellant's route. Appellant's only basis to contest this evidence is a single untimely statement that he attributes to Mr. Gambardella—i.e., "this is how we look after our own"—which, as discussed above, is facially non-discriminatory.

Moreover, Appellant's baseless conjecture is belied by the fact that Aramark also reassigned stops from white RSRs to Mr. Estrada—the Hispanic RSR who was assigned to the Bulk Route. A549 ¶¶ 15-18.

As such, Appellant has no evidence to suggest that the reassignment of stops had anything to do with his race, which is independently fatal to his constructive discharge claim based on those reassignments (which, again, are untimely).

\* \* \*

Accordingly, while it is clear that the District Court properly considered all of the evidence in the light most favorable to Appellant in analyzing Aramark's motion for summary judgment, even if this Court were to conduct a de novo review, the only conclusion supported by the record evidence is that Appellant's claim could not have survived summary judgment.

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT APPELLANT COULD NOT PURSUE PUNITIVE DAMAGES ON HIS Constructive DISCHARGE CLAIM.

### A. Appellant Cannot Pursue a Standalone Claim for Punitive Damages.

The District Court properly recognized that Appellant's request for punitive

damages under Title VII is not a standalone cause of action and therefore could not proceed in the absence of a viable Title VII claim, which Appellant does not have. *See* A1019, n.12.

The District Court's decision is consistent with the weight of authority in this Circuit. *See, e.g.*, *Excelsior Cap. LLC v. Allen*, 536 F. App'x 58, 60 (2d Cir. 2013) ("[A] request for punitive damages in New York is nonviable absent a valid claim for compensatory damages." (cleaned up; citation omitted); *Martin v. Dickson*, 100 F. App'x 14, 16 (2d Cir. 2004) ("[T]here is no separate cause of action in New York for punitive damages."); *Rocanova v. Equit. Life Assur. Soc'y. of the U.S.*, 634 N.E.2d 940, 945 (N.Y. 1994) ("A demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action."); *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 350, n.1 (N.D.N.Y. 2008), *aff'd*, 331 F. App'x 894 (2d Cir. 2009) ("[P]laintiffs' request for punitive damages is a form of relief sought, not a separate cause of action"); *ACR Sys., Inc. v. Woori Bank*, 232 F. Supp. 3d 471, 480 (S.D.N.Y. 2017) ("Because punitive damages are not available as a standalone claim, leave to amend the cause of action for punitive damages is denied as futile."); *Kwas v. Intergraph Gov't Sols.*, No. 15-5897, 2016 WL 4502039, at *2 n.1 (E.D.N.Y. Aug. 24, 2016) ("In any event, the Court agrees that a separate claim for punitive damages does not exist under New York law."); *MCM Prods. U.S. v. Botton*, No. 16-1616, 2016 WL 5107044, at *8 (S.D.N.Y. Sept.

42

16, 2016) ("[T]here is no separate claim for punitive damages recognized under New York law."); *Jones v. E. Brooklyn Sec. Servs. Corp.*, No. 11-6333, 2014 WL 4724699, at *3 n.1 (E.D.N.Y. Sept. 23, 2014) ("[A] separate claim or demand for punitive damages must be dismissed when all claims for liability are dismissed[.]"); *Schechter v. Alpert*, No. 05-10638, 2006 WL 8461750, at *3 (S.D.N.Y. Mar. 14, 2006) ("This Court agrees that there is no such thing as a separate claim for punitive damages[.]"); *Hubbell v. Trans World Life Ins. Co. of N.Y.*, 408 N.E.2d 918, 919 (N.Y. 1980) ("[W]e note that absent a valid claim for compensatory damages, there could be none for punitive damages even if . . . [defendant's conduct] could be said to be such a gross disregard of its contractual obligations as to constitute morally culpable conduct for which punitive damages might be claimed.").

Indeed, courts in this Circuit repeatedly have held that 42 U.S.C. § 1981a, which authorizes punitive damages for Title VII claims, "is not an independent cause of action, but rather functions as a remedy provision for violations of Title VII." *Kaye v. Storm King Sch.*, No. 11-3369, 2011 WL 7101193, at *5 n.3 (S.D.N.Y. Nov. 18, 2011); *see also Graham v. Watertown City Sch. Dist.*, No. 10-0756, 2011 WL 1344149, at *4 (N.D.N.Y. Apr. 8, 2011) ("[§ 1981a] does not provide an independent cause of action. Instead, § 1981a(a)(2) enhances the remedies available to prevailing parties in certain actions." (internal citation omitted)); *Tate v. City of New York*, No. 16-1894, 2017 WL 10186809, at *16 (E.D.N.Y. Sept. 29, 2017) (dismissing

43

standalone claim for punitive damages under Title II of the ADA because "the request for punitive damages is not an independent cause of action"); *Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 563 (W.D.N.Y. 2013) (denying request for leave to amend to assert a claim for punitive damages under § 1983 because "punitive damages are a remedy and not a separate cause of action").

The authority in this Circuit also is consistent with prevailing authority in many other jurisdictions. *See, e.g.*, *Green*, 578 U.S. at 573 (Alito, J. concurring) (observing that a reference to a "claim for punitive damages" does not mean that punitive damages are actionable independent of an underlying tort claim) (citation omitted); *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554 (10th Cir. 1991) ("A punitive damage claim is not an independent cause of action or issue separate from the balance of a plaintiff's case. It is part and parcel of a liability determination and does not have any independent being until a jury has decided, based on the preponderance of the evidence, that not only was a defendant's conduct negligent, but that it was gross, willful, wanton or malicious."); *see also Molina v. Wells Fargo Bank, N.A.*, No. 16-0207, 2017 WL 1184047, at *5 (D. Utah Mar. 29, 2017) ("Wells Fargo is correct that punitive damages is not a separate cause of action. Instead, because it is a remedy, punitive damages is 'an extension' of Molina's other causes of action."); *Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, 277 F. Supp. 3d 889, 896 n.3 (W.D. Ky. 2017) ("[P]unitive damages is not a cause of action; rather

44

it is a form of damages available for violations of constitutional rights and the commission of tortious acts."); *Onodera v. Kuhio Motors, Inc*., No. 13-0044, 2013 WL 4511273, at *8 (D. Haw. Aug. 23, 2013) ("The Court grants the Motion as to the separate claim for punitive damages because 'a claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action.'" (internal citation omitted)); *Cordova v. N.M. Tax. & Revenue Dep't*, No. 08-0681, 2011 WL 7164459, at 42 n.22 (D.N.M. Dec. 28, 2011) ("If [the plaintiff] seeks punitive damages, she must plead and prove them as relief for each count, and not seek them in a separate, stand-alone claim."); *Williams v. Dakota Cnty. Bd. of Comm'rs*, No. 08:09-201, No. 09-0201, 2010 WL 964699, at *1 n.1 (D. Neb. Mar. 10, 2010) ("Though framed as a separate claim, a request for punitive damages is properly viewed as part of [the plaintiff's] prayer for relief.").

As Aramark argued in its original, pre-answer motion for summary judgment, the release of claims in the SDHR Settlement Agreement expressly applied to the claims and allegations in Plaintiff's Federal Complaint, which are wholly duplicative of those Appellant asserted in the SDHR Proceeding. CAA3. Specifically, the SDHR Agreement expressly memorialized the parties' intent "to settle and resolve fully and finally *all claims and allegations asserted by Barker in the SDHR Proceeding*." CAA4 (emphasis added). Moreover, pursuant to the release provision in that agreement, Appellant expressly "waives and releases *any and all claims and*

45

*allegations asserted in the SDHR Proceeding* . . . arising from or relating to any and *all acts, events and omissions alleged or could have been alleged in the SDHR Proceeding.*" CAA5 ¶ 1 (emphasis added). This language plainly covered the claims Appellant then asserted in his Federal Complaint, which incorporated by reference his entire SDHR case file. A22.

Notwithstanding, even if such a claim was actionable, the District Court nevertheless properly dismissed that claim based on its determination that Appellant's constructive discharge claim could not proceed beyond summary judgment. *See, Excelsior Cap. LLC*, 536 F. App'x at 60; *Martin*, 100 F. App'x at 16; *Rocanova*, 634 N.E.2d at 945; *Phillips*, 571 F. Supp. 2d at 350, n.1; *ACR Sys., Inc.*, 232 F. Supp. 3d at 480; *Kwas*, 2016 WL 4502039, at *2 n.1; *MCM Prods. U.S.*, 2016 WL 5107044, at *8; *Jones*, 2014 WL 4724699, at *3 n.1; *Schechter*, 2006 WL 8461750, at *3; *Hubbell*, 408 N.E.2d at 919; *Kaye*, 2011 WL 7101193, at *5 n.3; *Graham*, 2011 WL 1344149, at *4; *Tate*, 2017 WL 10186809, at *16; *Eldridge*, 968 F. Supp. 2d at 563.

### B. Appellant's Failure to Present Evidence in Support of His Request for Punitive Damages Was an Independent Basis to Grant Summary Judgment to Aramark.

Because the only remedy available to Appellant due to the release contained in his SDHR Settlement Agreement was punitive damages, even if Appellant had been able to satisfy the demanding standard for a constructive discharge claim (and

46

he could not) and even if Appellant could sustain a standalone claim for punitive damages (and he could not), summary judgment for Aramark was still appropriate because Appellant could not establish that the complained-of conduct met the higher standard applicable to punitive awards. *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) ("The showing required for an award of punitive damages is not the same as that required for liability.").

The Supreme Court has instructed that punitive damages under Title VII are available only where "**the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the [] federally protected rights'**" of an aggrieved individual. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (emphasis added; quoting 42 U.S.C. § 1981a(b)(1)). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535. "A 'positive element of conscious wrongdoing' is required for an award of punitive damages." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001) (quoting *Kolstad*, 527 U.S. at 538).

To satisfy this burden, Appellant needed to show that Aramark "discriminated (or retaliated) against him with **conscious knowledge it was violating the law**, or that it engaged in **egregious or outrageous conduct** from which an inference of malice or reckless indifference could be drawn." *Tepperwien v. Entergy Nuclear*

47

*Operations, Inc.*, 663 F.3d 556, 573 (2d Cir. 2011) (emphasis added) (internal quotations and citation omitted). Critically, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Kolstad*, 527 U.S. at 545 (citation omitted).

Even if the District Court had found that any of Aramark's managers discriminated against Appellant (and it did not), summary judgment on Appellant's claims was still proper because, as discussed above, there is no evidence of malicious or racist intent. *See* Pt. I.C. *supra.* Rather, the record is replete with undisputed facts regarding Aramark's good-faith efforts to comply with Title VII.

Aramark maintains a Policy Against Sexual Harassment & Other Workplace Harassment, which "applies to all Aramark employees and applicants for employment, and prohibits harassment whether engaged in by managers, supervisors, co-workers, or non-Aramark associates, such as customers or suppliers." A654. Aramark's policy strictly prohibits "any unwelcome verbal, visual, or physical conduct which denigrates or shows hostility or aversion toward an individual because of an individual's race, color, religion, national origin, age, sex, gender, pregnancy, disability, sexual orientation, gender identity, genetic information, military status, veteran status or other personal characteristic protected by applicable federal, state, or local law[.]" A653. Aramark's policy also provides

48

that an employee who "feel[s] that he or she has been a victim of harassment or has witnessed any conduct that may be inconsistent with this policy" must report the incident immediately to either their supervisor or human resources. A654.

Appellant acknowledged Aramark's employment policies during his employment, including the Policy Against Sexual Harassment & Other Workplace Harassment. A664; A565, 66:17-21. Mr. Gambardella, Mr. Calhoun, and Mr. Piccola each did the same. A775, A779, A782.

Tellingly, Appellant never complained about discrimination during the course of his employment with Aramark. The only "complaint" that he made—a labor grievance filed in January 2017—is asserted under the CBA's provisions related to route compensation, not the provisions related to discrimination, and the narrative in the grievance makes no reference to any allegedly discriminatory conduct. A786, A788.

Additionally, Appellant acknowledged that the ARO was intended, in part, to better distribute revenue across the routes to bring RSRs' pay in line with the terms of the new CBA. A542 ¶¶ 12-15; A546-47 ¶ 3; A579-80, 108:24-109:13; A583-84, 130:24-131:4; A578, 106:11-20. Indeed, Appellant believes that the purpose of the ARO expressly was to increase compensation for Black RSRs. A580, 109:2-13.

All of these facts establish that Aramark engaged in good-faith efforts to comply with Title VII, which is a bar on awarding Appellant punitive damages even

49

if Appellant could have prevailed on the merits of his constructive discharge claim (which he could not do). Because the only relief available to Appellant was punitive damages relief, Appellant's inability to establish a basis for such relief was an independent basis to award Aramark summary judgment.

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's grant of summary judgment to Aramark on Appellant's constructive discharge claim and request for punitive damages.

Dated: September 16, 2025        Respectfully submitted,
           New York, New York

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Melissa C. Rodriguez*
      Melissa C. Rodriguez
      Michael F. Fleming
      101 Park Avenue
      New York, NY 10178-0060
      Telephone: (212) 309-6000
      Facsimile: (212) 309-6001
      melissa.rodriguez@morganlewis.com
      michael.fleming@morganlewis.com

      *Attorneys for Defendant-Appellee*
      *Aramark Uniform & Career Apparel,*
      *LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,489 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

*/s/ Melissa C. Rodriguez*
Melissa C. Rodriguez

## CERTIFICATE OF SERVICE

I, Melissa C. Rodriguez, hereby certify that on September 16, 2025, I caused the Brief of Defendant-Appellee to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all attorneys of record in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Melissa C. Rodriguez*
Melissa C. Rodriguez
